1   Robert C. Moest, Of Counsel, SBN 62166
2   **THE BROWN LAW FIRM, P.C.**
    2530 Wilshire Boulevard, Second Floor
3   Santa Monica, California 90403
    Telephone: (310) 915-6628
4   Facsimile: (310) 915-9897
    Email: RMoest@aol.com

5   *Counsel for Plaintiff*

6

7                **IN THE UNITED STATES DISTRICT COURT**
8                 **CENTRAL DISTRICT OF CALIFORNIA**

9   ERIC WEINER, derivatively on behalf of
10  BEYOND MEAT, INC.
                                            Case No.:
11          Plaintiff,

12          v.

13
    ETHAN BROWN, MARK J. NELSON,
14  SETH GOLDMAN, GREGORY
    BOHLEN, DIANE CARHART,
15  RAYMOND J. LANE, BERNHARD
    VAN LENGERICH, NED SEGAL,
16  CHRISTOPHER ISAAC "BIZ" STONE,
    DONALD THOMPSON, and KATHY
17  N. WALLER,

18          Defendants,

19
            and
20

21  BEYOND MEAT, INC.,

22          Nominal Defendant.

23

24          **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**
25

26
                    **DEMAND FOR JURY TRIAL**
27

28

## INTRODUCTION

Plaintiff Eric Weiner ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Beyond Meat, Inc. ("Beyond Meat" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Ethan Brown, Mark J. Nelson, Seth Goldman, Gregory Bohlen, Diane Carhart, Raymond J. Lane, Bernhard van Lengerich, Ned Segal, Christopher Isaac "Biz" Stone, Donald Thompson, and Kathy N. Waller (collectively, the "Individual Defendants," and together with Beyond Meat, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Beyond Meat, unjust enrichment, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, he alleges the following based upon personal knowledge as to his and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Beyond Meat, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Beyond Meat's directors and officers from May 2, 2019 through the present (the "Relevant Period").

2.      Beyond Meat is a provider of plant-based meat products, including beef, pork, and poultry substitutes. The Company's most popular offering is the Beyond

1

Burger, a plant-based burger sold in thousands of grocery stores and restaurants internationally.

3.     Prior to changing its corporate name in September 2018, Beyond Meat, was formerly known as a private company called Savage River, Inc. In 2014, the Company entered into a written exclusive supply agreement (the "Supply Agreement") with Don Lee Farms ("Don Lee"), a long-time manufacturer of plant-based and vegan protein products. Under the terms of the Supply Agreement, Don Lee would produce and ship to Beyond Meet all of the food products the Company required, including its notorious Beyond Burger.

4.     On May 23, 2017, Beyond Meat terminated the Supply Agreement, and began shifting its production to other manufacturers. Two days later, on May 25, 2017, Don Lee filed a lawsuit against the Company in the Superior Court of the State of California for the County of Los Angeles alleging breach of contract, misappropriation of trade secrets, and unfair competition, captioned *Don Lee Farms v. Savage River, Inc.*, Case No. BC662838 (Cal. Super. Ct.). Over the course of next several years, Don Lee added defendants and additional fraud and negligent misrepresentation claims against Beyond Meat, alleging, among other things, that during the period that Don Lee and the Company were working together, the Company had sent Don Lee tainted ingredients on various occasions, and that in response to concerns Don Lee raised over the Company's food safety protocols, Company employees provided to Don Lee a food safety inspector's report that had been edited to omit significant details concerning the safety of the Company's facilities. One of these defendants was Beyond Meat's current manufacturer, ProPortion Foods, LLC ("ProPortion"). The litigation also grew to include cross-complaints filed by the Company and ProPortion against Don Lee (collectively, the "Don Lee Action").

5.     In May 2019, while the Don Lee Action was ongoing, the Company completed its initial public offering ("IPO"). On May 2, 2019, Company shares began

trading on the NASDAQ Stock Exchange ("NASDAQ"), marking the beginning of the Relevant Period.

6.     Throughout the Relevant Period, until November 2019, at least, the Individual Defendants caused the Company to consistently make statements in the Company's SEC filings denying the validity of Don Lee's claims and asserting that the Company was justified in terminating the Supply Agreement. In reality, however, Don Lee's claims had far more merit than the Individual Defendants were willing to admit to the investing public.

7.     The truth was revealed to the public on January 27, 2020, when *Business Wire* published an article announcing that the court in the Don Lee Action had issued two separate rulings;[1] the first ruling granting Don Lee's request to file a third amended complaint naming Beyond Meat's Chief Financial Officer and Treasurer ("CFO"), along with certain other individuals as defendants with respect to Don Lee's fraud claims, and the second ruling granting Don Lee's request to attach certain documentary evidence and property belonging to Beyond Meat. These rulings indicated the "probable validity" of Don Lee's claims, contrary to the Company's representations.

8.     On this news, the price of the Company's stock dropped from $124.75 per share at the close of trading on January 27, 2020, to $120.12 at the close of trading on January 28, 2020, a drop of approximately 3.71%.

9.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Beyond Meat's business, operations, and compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the

---

[1]  https://www.businesswire.com/news/home/20200127005705/en/Judge-Rules-Don-Lee-Farms-Obtain-Judgment (last visited February 10, 2020).

Verified Shareholder Derivative Complaint

Company's termination of the Supply Agreement had constituted a breach of the agreement, and would foreseeably expose the Company to legal liability, costs, and damage to the Company's reputation; (2) the Company falsely represented the accuracy of a food safety consultant's report provided to Don Lee, which certain Company employees had doctored to, among other things, exclude pertinent safety information; and (3) Beyond Meat failed to maintain internal controls. As a result of the foregoing, Beyond Meat's public statements were materially false and misleading at all relevant times.

10.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

11.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

12.     Furthermore, during the Relevant Period, six of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales, obtaining proceeds of over $62.3 million.

13.     In light of the Individual Defendants' misconduct, which has subjected the Company and certain of its officers to being named as defendants in the Don Lee Action, and has subjected Beyond Meat, its President and Chief Executive Officer ("CEO"), and its CFO to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

14.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's and CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Beyond Meat's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

16.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

21.    Venue is proper in this District because Beyond Meat and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

22.    Plaintiff is a current shareholder of Beyond Meat common stock. Plaintiff has continuously held Beyond Meat common stock at all relevant times.

### Nominal Defendant Beyond Meat

23.    Beyond Meat is a Delaware corporation with its principal executive offices located at 119 Standard Street, El Segundo, California 90245. Beyond Meat's shares trade on NASDAQ under the ticker symbol "BYND."

### Defendant Brown

24.    Defendant Ethan Brown ("Brown") is the founder of the Company, and has served as the Company's President and CEO since 2009. According to the Company's Prospectus on Form 424B4 filed on August 2, 2019 (the "August 2019 Prospectus"), as of July 10, 2019, Defendant Brown beneficially owned 3,177,922 shares of the Company's common stock, which represented 5.14% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on July 10, 2019 was $163.51, Defendant Brown owned approximately $519.6 million worth of Beyond Meat stock.

25.    For the fiscal year ended December 31, 2018, Defendant Brown received $967,994 in compensation from the Company. This included $298,750 in salary, $524,244 in option awards, and $145,000 in non-equity incentive plan compensation.

26.    During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Brown made the following sale of company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|------|--------|------|----------|
| 8/5/2019 | 45,000 | $160.00 | $7,200,000 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

27.    The Company's August 2019 Prospectus stated the following about Defendant Brown:

> Ethan Brown is the founder of Beyond Meat and has served as our President and Chief Executive Officer and as a member of our board of directors since our inception in 2009. He also served as our Secretary since our inception to September 2018. Mr. Brown began his career with a focus on clean energy and the environment, serving as an energy analyst for the National Governors' Center for Best Practices. He then joined Ballard Power Systems (NASDAQ: BLDP), a hydrogen fuel-cell company where he worked for several years, being promoted from an entry-level manager to reporting directly to the Chief Executive Officer before leaving to found Beyond Meat. Mr. Brown also created and opened a center for fuel reformation and has held several industry positions, including Vice Chairman of the Board at The National Hydrogen Association and Secretary of the United States Fuel Cell Council. He is a Henry Crown Fellow at the Aspen Institute and, along with Beyond Meat, is the recipient of the United Nation's highest environmental accolade, Champion of the Earth (2018). Mr. Brown holds a MBA from Columbia University and an MPP with a focus on Environment from the University of Maryland. We believe Mr. Brown's strategic vision for the company and his expertise in technology and business operations makes him qualified to serve on our board.

**Defendant Nelson**

28.    Defendant Mark J. Nelson ("Nelson") has served as Beyond Meat's CFO since May 2017, and as Treasurer since September 2018. Previously, he served as the Company's Chief Operating Officer from May 2017 through September 2018, and as Secretary from September 2018 through May 2019. According to the August 2019 Prospectus, as of July 10, 2019, Defendant Nelson beneficially owned 744,221 shares of the Company's common stock, which represented 1.23% of the Company's outstanding

shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on July 10, 2019 was $163.51, Defendant Nelson owned approximately $121.6 million worth of Beyond Meat stock.

29.    For the fiscal year ended December 31, 2018, Defendant Nelson received $610,758 in compensation from the Company. This included $326,666 in salary, $121,591 in option awards, and $162,501 in non-equity incentive plan compensation.

30.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Nelson made the following sales of Company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|------|--------|------|----------|
| 8/5/2019 | 64,452 | $160.00 | $10,312,320 |
| 11/6/2019 | 70,000 | $81.34 | $5,693,870 |

Thus, in total, before the fraud was exposed, he sold 134,452 Company shares on inside information, for which he received approximately $16 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

31.    The Company's August 2019 Prospectus stated the following about Defendant Nelson:

Mark J. Nelson rejoined Beyond Meat as Chief Operating Officer and Chief Financial Officer in May 2017. In September 2018, he was also appointed Treasurer and Secretary and resigned his Chief Operating Officer position. He resigned as Secretary in May 2019. Mr. Nelson briefly served as Senior Vice President and Chief Financial Officer of Biolase (NASDAQ: BIOL), a medical device company, from March 2017 to May 2017. From February 2016 to March 2017, Mr. Nelson served as our Chief Operating Officer and Chief Financial Officer and from December 2015 to February 2016 served solely as our Chief Financial Officer. From April 2013 to November 2015, Mr. Nelson was Treasurer and Chief Financial Officer of Farmer Bros. Co.

(NASDAQ: FARM), a manufacturer, wholesaler and distributor of coffee, tea, spices and culinary products. Prior to that, Mr. Nelson served as Chief Accounting Officer (April 2010 to April 2013), Vice President, Corporate Controller (June 2008 to April 2010) and Vice President and General Manager (June 2006 to May 2008) at Newport Corporation, a formerly publicly traded global supplier of advanced-technology products and systems. He also worked at Thermo Fisher (NYSE: TMO), a biotechnology product development company from June 2002 to October 2004. Mr. Nelson has a BS degree in Business Administration from the University of Massachusetts at Amherst, and an MBA degree from Babson College.

**Defendant Goldman**

32.   Defendant Seth Goldman ("Goldman") has served as a Company director since February 2013 and is Chairman of the Board. He also served as Executive Chair of the Company from February 2013 until February 2020. According to the August 2019 Prospectus, as of July 10, 2019, Defendant Goldman beneficially owned 1,032,224 shares of the Company's common stock, which represented 1.71% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on July 10, 2019 was $163.51, Defendant Goldman owned approximately $168.7 million worth of Beyond Meat stock.

33.   For the fiscal year ended December 31, 2018, Defendant Goldman received $175,000 in compensation from the Company, which consisted entirely of fees paid for consulting services.

34.   The Company's August 2019 Prospectus stated the following about Defendant Goldman:

Seth Goldman joined Beyond Meat as Executive Chair and as a member of our board of directors in February 2013. Mr. Goldman is also currently the TeaEO Emeritus and Innovation Catalyst for Coca-Cola Company's Venturing & Emerging Brands, a part-time position he has held since November 2015. Mr. Goldman co-founded Honest Tea Inc., a bottled organic tea company, in February 1998, which was later sold to The Coca-Cola Company, and previously served as Honest Tea's President and TeaEO until 2015. In 2015, Mr. Goldman was named the #1 Disruptor by Beverage

World, and Beverage Executive of the Year by Beverage Industry magazine. He has also been recognized as an Ernst & Young Entrepreneur of the Year and the Washington DC Business Hall of Fame. In 2018, Partnership for a Healthier America recognized Mr. Goldman with its Visionary CEO award. Mr. Goldman serves on the advisory boards of Ripple Foods, a dairy-free plant-based milk company (November 2015 to present), the Yale School of Management (July 2013 to present), the American Beverage Association (April 2010 to present), and Bethesda Green, a local sustainability non-profit he co-founded (January 2008 to present). He has a BA degree in Government from Harvard College and a Masters of Private & Public Management degree from Yale School of Management and is a Henry Crown Fellow of the Aspen Institute. We believe that Mr. Goldman is qualified to serve on our board of directors due to his extensive experience working at fast-growing brands in the food and beverage industry, his experience founding and building an entrepreneurial company and his knowledge of sustainable business practices.

**Defendant Bohlen**

35.    Defendant Gregory Bohlen ("Bohlen") served as a Company director from February 2013 until he resigned on October 23, 2019. According to the August 2019 Prospectus, as of July 10, 2019, Defendant Bohlen beneficially owned 797,224 shares of the Company's common stock, which represented 1.32% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on July 10, 2019 was $163.51, Defendant Bohlen owned approximately $130.3 million worth of Beyond Meat stock.

36.    During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Bohlen made the following sale of company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|------|--------|------|----------|
| 8/5/2019 | 72,332 | $160.00 | $11,573,120 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

37.    The Company's 2019 Proxy Statement stated the following about Defendant Bohlen:

> Gregory Bohlen has served as a member of our board of directors since February 2013. Mr. Bohlen co-founded Union Grove Venture Partners, a venture capital firm, in March 2014 and serves as a Managing Partner. Prior to that, Mr. Bohlen served as Managing Director, Venture Capital at Morgan Creek Capital Management, LLC, an investment management services company, from November 2011 to March 2014 to extend Morgan Creek's venture exposure. From November 2002 to November 2011, Mr. Bohlen served as a managing director of Wasatch Advisors Cross Creek Fund, a venture capital firm. Mr. Bohlen's experience and relationships in the venture capital and investment banking communities span over 30 years, and he has invested in over 50 venture-backed companies. Mr. Bohlen has a BS degree in Agricultural Economics and a MBA degree from the University of Illinois at Urbana-Champaign. We believe that Mr. Bohlen is qualified to serve on our board of directors due to his deep experience in working with entrepreneurial companies.

### Defendant Carhart

38.    Defendant Diane Carhart ("Carhart") has served as a Company director since January 2016, and also serves as a member of the Audit Committee. According to the August 2019 Prospectus, as of July 10, 2019, Defendant Carhart beneficially owned 100,005 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 10, 2019 was $163.51, Defendant Carhart owned approximately $16.3 million worth of Beyond Meat stock.

39.    During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Carhart made the following sales of company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|---|---|---|---|
| 8/5/2019 | 9,069 | $160.00 | $1,451,040 |
| 10/30/2019 | 62,500 | $84.37 | $5,273,125 |

Thus, in total, before the fraud was exposed, she sold 71,569 Company shares on inside information, for which she received approximately $6.7 million. Her insider sales made

with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

40.    The Company's August 2019 Prospectus stated the following about Defendant Carhart:

> Diane Carhart has served as a member of our board of directors since January 2016. Ms. Carhart joined Stonyfield Farm, Inc., an organic yogurt maker, as Chief Financial Officer in April 1992. and also began serving as Chief Operating Officer in August 2006. Ms. Carhart has a BS degree in Accounting from the University of Connecticut and an MBA degree with a finance concentration from Boston University. We believe that Ms. Carhart is qualified to serve on our board because she has more than 40 years in accounting, finance and operations management with 26 years in the food industry.

## Defendant Lane

41.    Defendant Raymond J. Lane ("Lane") has served as a Company director since February 2015, and also serves as a member of the Compensation Committee. According to the August 2019 Prospectus, as of July 10, 2019, Defendant Lane beneficially owned 256,108 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 10, 2019 was $163.51, Defendant Lane owned approximately $41.8 million worth of Beyond Meat stock.

42.    The Company's August 2019 Prospectus stated the following about Defendant Lane:

> Raymond J. Lane has served as a member of our board of directors since February 2015. Mr. Lane has been a Managing Partner at GreatPoint Ventures, a venture capital firm since March 2015. Mr. Lane has served as a Partner Emeritus and Advisor of Kleiner, Perkins, Caufield & Byers LLC, a venture capital firm, since April 2013 and was a Managing Partner of Kleiner, Perkins, Caufield & Byers LLC from September 2000 to April 2013. Mr. Lane has served on the board of directors of Hewlett Packard Enterprises (NYSE: HPE) from November 2015 to the present. In addition, Mr. Lane previously served as a member of the board of directors of Hewlett

Packard, Inc. (NYSE: HPQ) from September 2010 to November 2015, where he also was the executive Chairman of the Board from September 2011 to April 2013 and the non-executive Chairman of the Board from November 2010 to September 2011. Prior to joining Kleiner Perkins, Mr. Lane was President and Chief Operating Officer and a director of Oracle Corporation, a software company. Mr. Lane also served as Chairman of the Board of Trustees of Carnegie Mellon University from July 2009 to July 2015. Mr. Lane holds a BS degree in Mathematics and honorary Ph.D. Science from West Virginia University. We believe that Mr. Lane is qualified to serve on our board of directors due to his experience in working with entrepreneurial companies and his experience on other public company boards of directors.

**Defendant van Lengerich**

43.     Defendant Bernhard van Lengerich ("van Lengerich") has served as a Company director since November 2016. According to the August 2019 Prospectus, as of July 10, 2019, Defendant van Lengerich beneficially owned 586,223 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 10, 2019 was $163.51, Defendant van Lengerich owned approximately $95.8 million worth of Beyond Meat stock.

44.     For the fiscal year ended December 31, 2018, Defendant van Lengerich received $120,000 in compensation from the Company, which consisted entirely of fees paid for consulting services.

45.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant van Lengerich made the following sale of Company stock:

| Date | Shares | Cost | Proceeds |
|------|--------|------|----------|
| 11/5/2019 | 133,147 | $82.66 | $11,005,664 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

46.    The Company's August 2019 Prospectus stated the following about Defendant van Lengerich:

> Bernhard van Lengerich, Ph.D., has served as a member of our board of directors since November 2016. Dr. van Lengerich joined General Mills, Inc. (NYSE: GIS), a multinational manufacturer and marketer of branded consumer food, in 1994 and was the Chief Scientific Officer and Vice President for Technology Strategy from 2007 until his retirement from General Mills in March 2015. Dr. van Lengerich is the founder of Seeding the Future Foundation, a 501c(3) organization focusing on food security in sub-Saharan Africa. He also founded Food System Strategies, LLC in 2015, pursuant to which he provides strategic advisory services to companies along the food value chain. Dr. van Lengerich served as our interim Chief Technical Officer and head of Research, Development and Innovation from February 2016 to February 2017 and has provided advisory services to us pursuant to an advisor agreement with Food System Strategies, LLC since October 2015. At General Mills, he led the development of key enabling capabilities resulting in both, new product innovations driving top line growth and major productivity benefits for General Mills' Holistic Margin Management program. He also led a new Game Changer program and created a novel "Cashless Venturing" initiative, enabling faster and more disruptive innovations. Dr. van Lengerich is inventor/co-inventor of over 150 national and international patents and patent applications and he is an IFT Fellow. He has MS and Ph.D. degrees in Food and Biotechnology from the Technical University of Berlin, which awarded him an Honorarium Professorship and where he also teaches Extrusion Processing. We believe that Dr. van Lengerich is qualified to serve on our board of directors due to his experience in the food industry and strong food science and technology background.

**Defendant Segal**

47.    Defendant Ned Segal ("Segal") has served as a Company director since November 2018, and also serves as a member of the Audit Committee. According to the August 2019 Prospectus, as of July 10, 2019, Defendant Segal beneficially owned 11,976 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 10, 2019 was $163.51, Defendant Segal owned approximately $1.95 million worth of Beyond Meat stock.

48.   For the fiscal year ended December 31, 2018, Defendant Segal received $149,522 in compensation from the Company, which consisted entirely of option awards.

49.   The Company's August 2019 Prospectus stated the following about Defendant Segal:

> Ned Segal has served as a member of our board of directors since November 2018. Mr. Segal has served as the Chief Financial Officer of Twitter Inc. (NYSE: TWTR) since August 2017. From January 2015 to August 2017, Mr. Segal served as Senior Vice President of Finance of Intuit Inc. (NASDAQ: INTU), a small business and financial software company. From April 2013 to January 2015, Mr. Segal served as Chief Financial Officer of RPX Corporation, a former publicly traded company that provides patent risk management and discovery services. From 1996 to April 2013, Mr. Segal held various positions at The Goldman Sachs Group, Inc. (NYSE: GS), most recently as Head of Global Software Investment Banking. Mr. Segal holds a BS degree in Spanish from Georgetown University. We believe that Mr. Segal is qualified to serve on our board because of his experience in finance at a number of major public companies.

**Defendant Stone**

50.   Defendant Christopher Isaac "Biz" Stone ("Stone") has served as a Company director since January 2012, and also serves as the Chair of the Nominating and Corporate Governance Committee. According to the August 2019 Prospectus, as of July 10, 2019, Defendant Stone beneficially owned 18,519 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 10, 2019 was $163.51, Defendant Stone owned approximately $3.02 million worth of Beyond Meat stock.

51.   During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Stone made the following sales of Company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|------|--------|------|----------|
| 10/30/2019 | 20,000 | $88.02 | $1,760,380 |

| 11/7/2019 | 20,000 | $78.51 | $1,570,180 |
| 11/14/2019 | 10,000 | $82.00 | $820,000 |
| 11/20/2019 | 20,000 | $78.04 | $1,560,800 |
| 11/27/2019 | 20,000 | $82.01 | $1,640,160 |
| 11/29/2019 | 30,000 | $83.62 | $2,508,750 |

Thus, in total, before the fraud was exposed, he sold 120,000 Company shares on inside information, for which he received approximately $9.86 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

52.    The Company's August 2019 Prospectus stated the following about Defendant Stone:

> Christopher Isaac "Biz" Stone has served as a member of our board of directors since January 2012. Mr. Stone is a Co-founder of Twitter, Inc. (NYSE: TWTR) where he has served as Creative Director since 2006 with a hiatus as Advisor between 2012 and 2017. Mr. Stone was the Co-Founder and Chief Executive Officer at Jelly Industries, Inc. from January 2013 to March 2017. Biz served as Special Advisor to the founders of Pinterest from March 2017 to March 2018, has been a Visiting Fellow at Oxford University since August 2015, has served as an advisor to The Global AI Council since August 2018 and is an active angel investor in companies such as Slack, Square, and Intercom. In addition to Twitter, Inc., Mr. Stone co-founded A Medium Corporation in January 2012, which provides an online publishing platform and has served as a member of its Board of Directors since January 2012 and as Creative Director from February 2012 to April 2013. He was also Chairman of the Board of Polaroid Swing, Inc. from July 2016 to November 2017 and was an independent director of Workpop, Inc. from September 2014 until May 2017. His honors include Inc. magazine's Entrepreneur of the Decade, TIME magazine's 100 Most Influential People in the World, GQ magazine's Nerd of the Year and The Economist's "Innovation Award." We believe that Mr. Stone is qualified to serve on our board of directors due to his extensive experience in working with entrepreneurial companies.

**Defendant Thompson**

53.    Defendant Donald Thompson ("Thompson") has served as a Company

director since October 2015, and also serves as the Chair of the Compensation Committee. According to the August 2019 Prospectus, as of July 10, 2019, Defendant Thompson beneficially owned 2,632,384 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 10, 2019 was $163.51, Defendant Thompson owned approximately $430.4 million worth of Beyond Meat stock.

54. The Company's August 2019 Prospectus stated the following about Defendant Thompson:

> Donald Thompson has served as a member of our board of directors since October 2015. Mr. Thompson is the Founder and Chief Executive Officer of Cleveland Avenue, LLC, which he founded in 2015. Mr. Thompson served as Chief Executive Officer and President of McDonald's Corp. (NYSE: MCD) from July 2012 to March 2015 and as Chief Operating Officer of McDonald's Corp. from January 2010 to June 2012. Mr. Thompson has been a member of the board of directors of Northern Trust Corporation (NASDAQ: NTRS), a financial services company, since March 2015 and has been a member of the board of directors of Royal Caribbean Cruises Ltd. (NYSE: RCL), a global cruise company, since May 2015. Mr. Thompson has been a member of the Advisory Board of DocuSign, Inc. (NASDAQ: DOCU), an electronic signature technology company, since February 2016. He serves on the Board of Trustees of Northwestern Memorial Hospital, Cleveland Avenue Foundation for Education and Purdue University (July 2009 to present). Mr. Thompson served as a member of the board of directors of McDonald's Corp. from January 2011 to March 2015 and as a member of the board of directors of Exelon Corporation (NYSE: EXC), an energy company, from May 2007 to April 2013. Mr. Thompson has a BS degree in Electrical Engineering from Purdue University and a Doctor of Science degree from Excelsior College in Albany, New York. We believe that Mr. Thompson is qualified to serve on our board of directors due to his experience in the food industry and his experience on other public company boards of directors.

**Defendant Waller**

55. Defendant Kathy N. Waller ("Waller") has served as a Company director since November 2018, and also serves as the Chair of Audit Committee and as a member

of the Nominating and Corporate Governance Committee. According to the August 2019 Prospectus, as of July 10, 2019, Defendant Waller beneficially owned 7,476 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 10, 2019 was $163.51, Defendant Waller owned approximately $1.22 million worth of Beyond Meat stock.

56.     For the fiscal year ended December 31, 2018, Defendant Waller received $149,522 in compensation from the Company, which consisted entirely of option awards.

57.     The Company's August 2019 Prospectus stated the following about Defendant Waller:

> Kathy N. Waller has served as a member of our board of directors since November 2018. Before her retirement in March 2019, Ms. Waller was Executive Vice President, Chief Financial Officer and President, Enabling Services of The Coca-Cola Company (NYSE: KO). Ms. Waller joined The Coca-Cola Company in 1987 as a senior accountant in the Accounting Research Department and has served in a number of accounting and finance roles of increasing responsibility. From July 2004 to August 2009, Ms. Waller served as Chief of Internal Audit. In December 2005, she was elected Vice President of The Coca-Cola Company, and in August 2009, she was elected Controller. In August 2013, she became Vice President, Finance and Controller, assuming additional responsibilities for corporate treasury, corporate tax and finance capabilities, and served in that position until April 2014, when she was appointed Chief Financial Officer and elected Executive Vice President. Ms. Waller assumed expanded responsibility for The Coca-Cola Company's strategic governance areas when she was also appointed to serve as President, Enabling Services, on May 1, 2017. Ms. Waller joined the board of directors of CGI, Group. Inc. in December 2018 and serves on its Audit Committee. She received a BA degree from the University of Rochester in New York and a MBA degree from the William E. Simon School of Business Administration at the University of Rochester, and is a CPA. We believe that Ms. Waller is qualified to serve on our board because she has more than 30 years of experience in accounting and finance at a major public company.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

58.     By reason of their positions as officers, directors, and/or fiduciaries of Beyond Meat and because of their ability to control the business and corporate affairs of Beyond Meat, the Individual Defendants owed Beyond Meat and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Beyond Meat in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Beyond Meat and its shareholders so as to benefit all shareholders equally.

59.     Each director and officer of the Company owes to Beyond Meat and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

60.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Beyond Meat, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

61.     To discharge their duties, the officers and directors of Beyond Meat were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

62.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Beyond Meat, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or

should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Beyond Meat's Board at all relevant times.

63.   As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

64.   To discharge their duties, the officers and directors of Beyond Meat were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Beyond Meat were required to, among other things:

(a)   ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Beyond Meat's own Code of Business Ethics and Conduct (the "Code of Conduct");

(b)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Beyond Meat conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Beyond Meat and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Beyond Meat's operations would comply with all applicable laws and Beyond Meat's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

65.     Each of the Individual Defendants further owed to Beyond Meat and the shareholders the duty of loyalty requiring that each favor Beyond Meat's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

66.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Beyond Meat and were at all times acting within the course and scope of such agency.

67.     Because of their advisory, executive, managerial, and directorial positions with Beyond Meat, each of the Individual Defendants had access to adverse, non-public information about the Company.

68.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Beyond Meat.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

69.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

70.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets.

71.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority

of the Board, each of the Individual Defendants who are directors of Beyond Meat was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

72.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

73.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Beyond Meat and was at all times acting within the course and scope of such agency.

## BEYOND MEAT'S CODE OF CONDUCT

74.    The Company's Code of Conduct states that it is meant to "provide guidance applicable to all members of the Company's Board of Directors ("directors") and officers, employees, independent contractors and consultants of the Company."

75.    In a section titled, "Legal Compliance," the Code of Conduct states the following:

> All employees must always obey the law while performing their duties to the Company. The Company's success depends upon each employee operating within legal guidelines and cooperating with authorities. It is essential that all employees know and understand the legal and regulatory requirements that apply to the Company's business and to their specific area of responsibility. While an employee is not expected to have complete mastery of these laws, rules and regulations, employees are expected to be able to recognize situations that require consultation with others to determine the appropriate course of action. See Section 18 (Compliance Standards and Procedures) for a description of whom to contact with questions about legal compliance.

76.    In a section titled, "Insider Trading," the Code of Conduct states the following:

> Every employee is prohibited from using "inside" or material nonpublic information about the Company, or about companies with which the Company does business, in connection with buying or selling the Company's or such other companies' securities, including "tipping" others who might make an investment decision on the basis of this information. It is illegal, and it is a violation of this Code, the Company's Insider Trading Policy (the "Insider Trading Policy") and other Company policies, to tip or to trade on inside information. Employees who have access to inside information are not permitted to use or share that inside information for stock trading purposes or for any other purpose except to conduct Company business.

77.    In a section titled, "Financial Integrity; Public Reporting," the Code of Conduct states the following:

> The Company strives to maintain integrity of the Company's records and public disclosure. The Company's corporate and business records, including all supporting entries to the Company's books of account, must be completed honestly, accurately and understandably. The Company's records are important to investors and creditors. They serve as a basis for managing the Company's business and are important in meeting the Company's obligations to business partners, suppliers, vendors, creditors, employees and others with whom the Company does business. The Company depends on the books, records and accounts accurately and fairly reflecting, in reasonable detail, the Company's assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

> To help ensure the integrity of the Company's records and public disclosure, the Company requires that:

> - no entry be made in the Company's books and records that is intentionally false or misleading;
>
> - transactions be supported by appropriate documentation;
>
> - the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such

documentation be reflected accurately in the Company's books and records;

- employees comply with the Company's system of internal controls and be held accountable for their entries;

- any off-balance sheet arrangements of the Company are clearly and appropriately disclosed;

- employees work cooperatively with the Company's independent auditors in their review of the Company's financial statements and disclosure documents;

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund; and

- records be retained or destroyed according to the Company's document retention policies or procedures then in effect.

78.    The "Financial Integrity; Public Reporting" section of the Code of Conduct further states the following regarding the Company's disclosure controls and procedures:

- no employee may take or authorize any action that would cause the Company's financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations

- all employees must cooperate fully with the Company's finance department, as well as the Company's independent auditors and legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that the Company's books and records, as well as its reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of the Company's reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects.

79.    The "Financial Integrity; Public Reporting" section of the Code of Conduct goes on to provide that the Company's directors must comply with the following additional guidelines:

- act honestly, ethically, and with integrity;

- comply with this Code;

- endeavor to ensure complete, fair, accurate, timely and understandable disclosure in the Company's filings with the SEC;

- raise questions and concerns regarding the Company's public disclosures when necessary and ensure that such questions and concerns are appropriately addressed;

- act in good faith in accordance with the director's business judgment, without misrepresenting material facts or allowing independent judgment to be subordinated by others; and

- comply with the Company's disclosure controls and procedures and internal controls over financial reporting.

80.    In a section titled, "Conduct of Senior Financial Employees," the Code of Conduct provides that the Company's CEO and CFO must:

- Act with honesty and integrity and use due care and diligence in performing their responsibilities to the Company.

* * *

- Provide constituents with information that is accurate, complete, objective, relevant, timely and understandable, including information for inclusion in the Company's submissions to governmental agencies or in public statements.

- Comply with applicable laws, rules, and regulations of federal, state and local governments, and of any applicable public or private regulatory and listing authorities.

- Achieve responsible use of and control over all assets and resources entrusted to each Senior Financial Employee.

81.   In a section titled, "Protection and Proper Use of Company Assets," the Code of Conduct states the following:

> All employees are expected to protect the Company's assets and ensure their efficient use for legitimate business purposes. Theft, carelessness and waste have a direct impact on the Company's business and operating results. Company property, such as computer equipment, buildings, furniture and furnishings, office supplies, products and inventories, should be used only for activities related to an employee's employment, although incidental personal use is permitted. The Company retains the right to access, review, monitor and disclose any information transmitted, received or stored using the Company's electronic equipment, with or without an employee's or third party's knowledge, consent or approval. Any theft, misuse or suspected theft or misuse of the Company's assets that becomes known to an employee must be immediately reported.

82.   The Individual Defendants violated Beyond Meat's Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, and failing to report the same. Moreover, six of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

83.   Beyond Meat is a California-based food company that offers a variety of plant-based meat products, including vegan beef, pork, and poultry. The Company was founded in 2009. The Company was formerly known as Savage River Inc., and changed its corporate name to Beyond Meat in September 2018.

84.   The Company's most successful product is the Beyond Burger, a popular vegan burger sold in thousands of grocery stores and restaurants across the U.S., Canada,

and several other countries. Historically, the Company has made use of co-manufacturers to process and package the Company's products, including the Beyond Burger, which the Company then distributes and markets.

**The Don Lee Action**

85.     In 2014, the Company entered into the Supply Agreement with Don Lee, a producer of plant-based meat substitutes and other food products. Pursuant to the Supply Agreement, Don Lee would produce, test, and ship to Beyond Meat all of Beyond Meat's product offerings, including the Company's flagship product, the Beyond Burger.

86.     The Supply Agreement remained in place for approximately three years, until on May 23, 2017, not long after the launch of the Beyond Burger, Beyond Meat terminated the Supply Agreement, citing Don Lee's failure to rectify certain alleged breaches of the agreement. Subsequently, Beyond Meat began sourcing its production to other manufacturers, such as ProPortion.

87.     Two days later, on May 25, 2017, Don Lee commenced the Don Lee Action, asserting claims against Beyond Meat for breach of contract, misappropriation of trade secrets, and unfair competition arising out of Beyond Meat's termination of the Supply Agreement.

88.     In July 2017, Beyond Meat filed a cross-complaint against Don Lee alleging breach of contract, unfair competition, and unlawful conversion of Beyond Meat property.

89.     As the litigation proceeded, Don Lee added ProPortion as a defendant in an amended complaint filed in October 2018, and added additional claims of fraud and negligent misrepresentation against Beyond Meat, alleging that Don Lee had discovered plastic, cardboard, and metal waste in raw ingredients provided to Don Lee by the Company, and that a Beyond Meat truck had once delivered a batch of ingredients contaminated by an unknown white powder. Don Lee further alleged that Beyond Meat had provided to Don Lee a doctored version of a third-party safety consultant's report on

Verified Shareholder Derivative Complaint

Beyond Meat's facilities, while representing that the report constituted the full opinion of the safety consultant, thereby inducing Don Lee to agree to expand the scope of the Supply Agreement and Don Lee's commitments to Beyond Meat.

90.    While still in the midst of the Don Lee Action, in May 2019, the Company conducted its IPO. The IPO was initiated on May 2, 2019, and subsequently, the Company issued 11,068,750 shares priced at $25.00 per share, ultimately raising over $240 million. The Company's shares began trading at $46 per share and surged to nearly $73 per share by the open of the following trading day. The Company's IPO was "the biggest-popping IPO for a U.S. company that raised more than $200 million since 2000[.]"[2]

91.    Throughout the Relevant Period, the Don Lee Action was discussed in many of the Company's public statements filed with the SEC. However, these statements were limited to generic disclaimers merely noting that the Company "could" face liability or be required to pay damages in connection with the Don Lee Action, which were inaccurate in light of the Individual Defendants' knowledge of the Company's conduct with respect to Don Lee and the Supply Agreement.

92.    On January 27, 2020, Don Lee filed its Third Amended Complaint in the Don Lee Action. The litigation remains ongoing as of the date of filing this Complaint.

**False and Misleading Statements**

***The IPO Documents***

93.    On May 3, 2019, the day after the Company's stock began trading on NASDAQ, the Company filed with the SEC a Prospectus on Form 424B4 (the "May 2019 Prospectus") in connection with the IPO. The May 2019 Prospectus formed part of the Company's Registration Statement on Form S-1 filed on November 16, 2018, before the Company went public (the "May 2019 Registration Statement," and together with the

---

[2] https://www.marketwatch.com/story/beyond-meat-soars-163-in-biggest-popping-us-ipo-since-2000-2019-05-02 (last visited March 16, 2020).

Verified Shareholder Derivative Complaint

May 2019 Prospectus, the "IPO Documents.") The May 2019 Registration Statement was signed by Defendants Brown, Nelson, Goldman, Bohlen, Carhart, Lane, van Lengerich, Segal, Stone, Thompson, Waller, and non-party Michael A. Pucker.

94.     In a discussion of the risk factors facing the Company, the IPO Documents stated the following with respect to the Don Lee Action:

> For example, on May 25, 2017, following our termination of our supply agreement with Don Lee Farms, a co-manufacturer, Don Lee Farms filed a lawsuit against us in California state court claiming that we wrongfully terminated the parties' contract and that we misappropriated their trade secrets by sharing with subsequent co- manufacturers the processes for manufacturing our products-processes which they claim to have developed. On July 27, 2017 we filed a cross-complaint, alleging that Don Lee Farms (1) breached the supply agreement, including by failing to provide saleable product, as certain of our products manufactured by Don Lee Farms were contaminated with salmonella and other foreign objects, and that Don Lee Farms did not take appropriate actions to address these issues; (2) engaged in unfair competition in violation of California's Unfair Competition Law; and (3) unlawfully converted certain Beyond Meat property, including certain pieces of equipment. Don Lee Farms is seeking unspecified compensatory and punitive damages, declaratory and injunctive relief, including the prohibition of Beyond Meat's use or disclosure of the alleged trade secrets, and attorneys' fees and costs. In addition, in October 2018, Don Lee Farms amended its complaint to add ProPortion Foods, LLC (one of Beyond Meat's current contract manufacturers) as a defendant, principally for claims arising from ProPortion's alleged use of Don Lee Farms' alleged trade secrets, and for replacing Don Lee Farms as Beyond Meat's co-manufacturer. We are seeking monetary damages, restitution of monies paid to Don Lee Farms, and attorneys' fees and costs. *We believe we were justified in terminating the supply agreement with Don Lee Farms, that we did not misappropriate their alleged trade secrets and that Don Lee Farms is liable for the conduct alleged in our cross-complaint. We intend to vigorously defend ourselves against their claims and prosecute our own.* However, we cannot assure you that they will not prevail in all or some of their claims against us or that we will prevail in some or all of our claims against Don Lee Farms. If Don Lee Farms succeeds in the lawsuit, *we could be required to pay contract damages*, reasonably calculated at what we would have paid them to produce our products through 2019, the end of the contract term, and *Don Lee Farms could also claim some ownership in the*

*intellectual property that we possess in our products*, and thus claim a stake in the value we will derive from that intellectual property going forward.

Even when not merited, the defense of these lawsuits may divert our management's attention, and we may incur significant expenses in defending these lawsuits. The results of litigation and other legal proceedings are inherently uncertain, and adverse judgments or settlements in some of these legal disputes may result in adverse monetary damages, penalties or injunctive relief against us, which could have a material adverse effect on our financial position, cash flows or results of operations. Any claims or litigation, even if fully indemnified or insured, could damage our reputation and make it more difficult to compete effectively or to obtain adequate insurance in the future.

(Emphasis added.)

### June 12, 2019 Form 10-Q

95.     On June 12, 2019, the Company filed with the SEC its quarterly report for the first fiscal quarter ended March 30, 2019 on Form 10-Q (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendants Brown and Nelson, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Brown and Nelson attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

96.     In its section on legal proceedings, the 1Q19 10-Q made representations similar to those made in the May 2019 Prospectus with respect to the Don Lee Action, stating the following:

On May 25, 2017, Don Lee Farms, a division of Goodman Food Products, Inc., filed a complaint against us in the Superior Court of the State of California for the County of Los Angeles asserting claims for breach of contract, misappropriation of trade secrets, unfair competition under the California Business and Professions Code, money owed and due, declaratory relief and injunctive relief, each arising out of our decision to terminate an exclusive supply agreement between us and Don Lee Farms. *We deny all of*

*these claims* and filed counterclaims on July 27, 2017, alleging breach of contract, unfair competition under the California Business and Professions Code and conversion.

\* \* \*

*We believe we were justified in terminating the supply agreement with Don Lee Farms, that we did not misappropriate their alleged trade secrets, that we are not liable for the fraud or negligent misrepresentation alleged in the proposed second amended complaint, that Don Lee Farms is liable for the conduct alleged in our cross-complaint, and that we are not liable to ProPortion for any indemnity, contribution, or repayment, including for any damages or attorney's fees and costs. We are currently in the process of litigating this matter and intend to vigorously defend ourselves against the claims.* We cannot assure you that Don Lee Farms or ProPortion will not prevail in all or some of their claims against us, or that we will prevail in some or all of our claims against Don Lee Farms. For example, if Don Lee Farms succeeds in the lawsuit, *we could be required to pay damages, including but not limited to contract damages* reasonably calculated at what we would have paid Don Lee Farms to produce our products through 2019, the end of the contract term, and *Don Lee Farms could also claim some ownership in the intellectual property associated with the production of certain of our products or in the products themselves*, and thus claim a stake in the value we have derived and will derive from the use of that intellectual property after we terminated our supply agreement with Don Lee Farms. Based on our current knowledge, we have determined that the amount of any material loss or range of any losses that is reasonably possible to result from this lawsuit is not estimable.

(Emphasis added.)

### July 29, 2019 Form 10-Q

97.    On July 29, 2019, the Company filed with the SEC its quarterly report for the second fiscal quarter ended June 29, 2019 on Form 10-Q (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendants Brown and Nelson, and contained SOX certifications signed by Defendants Brown and Nelson attesting to the accuracy of the 2Q19 10-Q.

98.    The 2Q19 10-Q stated the following concerning the Don Lee Action:

On May 25, 2017, Don Lee Farms, a division of Goodman Food Products, Inc., filed a complaint against us in the Superior Court of the State of California for the County of Los Angeles asserting claims for breach of contract, misappropriation of trade secrets, unfair competition under the California Business and Professions Code, money owed and due, declaratory relief and injunctive relief, each arising out of our decision to terminate an exclusive supply agreement between us and Don Lee Farms. ***We deny all of these claims*** and filed counterclaims on July 27, 2017, alleging breach of contract, unfair competition under the California Business and Professions Code and conversion.

* * *

***On June 19, 2019, we filed an answer denying Don Lee Farms' claims***. Trial is currently set for May 18, 2020.

* * *

***We believe we were justified in terminating the supply agreement with Don Lee Farms, that we did not misappropriate their alleged trade secrets, that we are not liable for the fraud or negligent misrepresentation alleged in the proposed second amended complaint, that Don Lee Farms is liable for the conduct alleged in our cross-complaint, and that we are not liable to ProPortion for any indemnity, contribution, or repayment, including for any damages or attorney's fees and costs. We are currently in the process of litigating this matter and intend to vigorously defend ourselves against the claims***. We cannot assure you that Don Lee Farms or ProPortion will not prevail in all or some of their claims against us, or that we will prevail in some or all of our claims against Don Lee Farms. For example, if Don Lee Farms succeeds in the lawsuit, ***we could be required to pay damages, including but not limited to contract damages*** reasonably calculated at what we would have paid Don Lee Farms to produce our products through 2019, the end of the contract term, and ***Don Lee Farms could also claim some ownership in the intellectual property associated with the production of certain of our products or in the products themselves***, and thus claim a stake in the value we have derived and will derive from the use of that intellectual property after we terminated our supply agreement with Don Lee Farms. Based on our current knowledge, we have determined that the amount of any material loss or range of any losses that is reasonably possible to result from this lawsuit is not estimable.

(Emphasis added.)

1

2      ***The Secondary Public Offering Documents***

3      99.   Also on July 29, 2019, the Company filed with the SEC a Registration

4      Statement on Form S-1 (the "July 2019 Registration Statement") in connection with a

5      planned secondary public offering. The July 2019 Registration Statement was signed by

6      Defendants Brown, Nelson, Goldman, Bohlen, Carhart, Lane, van Lengerich, Segal,

7      Stone, Thompson, and Waller. Subsequently, on August 2, 2019, the Company filed the

8      August 2019 Prospectus, which formed part of the July 2019 Registration Statement

9      (collectively, the "SPO Documents.").

10     100.   The SPO Documents stated the following with respect to the Don Lee

11     Action:

12         For example, on May 25, 2017, following our termination of our supply
13         agreement with Don Lee Farms, a co-manufacturer, Don Lee Farms filed a
           lawsuit against us in California state court claiming that we wrongfully
14         terminated the parties' contract and that we misappropriated their trade
15         secrets principally by sharing with subsequent co-manufacturers the
           processes for manufacturing our products—processes which they claim to
16         have developed. On July 27, 2017 we filed a cross-complaint, alleging that
17         Don Lee Farms (1) breached the supply agreement, including by failing to
           provide saleable product, as certain of our products manufactured by Don
18         Lee Farms were contaminated with salmonella and other foreign objects, and
19         that Don Lee Farms did not take appropriate actions to address these issues;
           (2) engaged in unfair competition in violation of California's Unfair
20         Competition Law; and (3) unlawfully converted certain Beyond Meat
21         property, including certain pieces of equipment. In October 2018, Don Lee
           Farms filed an amended complaint that added ProPortion Foods, LLC (one
22         of Beyond Meat's current contract manufacturers) as a defendant,
23         principally for claims arising from ProPortion's alleged use of Don Lee
           Farms' alleged trade secrets, and for replacing Don Lee Farms as Beyond
24         Meat's co-manufacturer. ProPortion filed an answer denying all of Don Lee
25         Farms' claims and a cross-complaint against Beyond Meat asserting claims
           of total and partial equitable indemnity, contribution, and repayment. On
26         March 11, 2019, Don Lee Farms filed a second amended complaint to add
27         claims of fraud and negligent misrepresentation against us. On May 30,
28         2019, the judge denied our motion to dismiss the fraud and negligent

misrepresentation claims, allowing the claims to proceed. On June 19, 2019, *we filed an answer denying Don Lee Farms' claims*. Trial is currently set for May 18, 2020.

Don Lee Farms is seeking from us and ProPortion unspecified compensatory and punitive damages, declaratory and injunctive relief, including the prohibition of our use or disclosure of the alleged trade secrets, and attorneys' fees and costs. We are seeking from Don Lee Farms monetary damages, restitution of monies paid to Don Lee Farms, and attorneys' fees and costs. ProPortion is seeking indemnity, contribution, or repayment from us of any or all damages that ProPortion may be found liable to Don Lee Farms, and attorney's fees and costs. *We believe we were justified in terminating the supply agreement with Don Lee Farms, that we did not misappropriate their alleged trade secrets, that we are not liable for the fraud or negligent misrepresentation alleged in the proposed second amended complaint, that Don Lee Farms is liable for the conduct alleged in our cross-complaint, and that we are not liable to ProPortion for any indemnity, contribution, or repayment, including for any damages or attorney's fees and costs*.

*We intend to vigorously defend ourselves against the claims and prosecute our own*. However, we cannot assure you that Don Lee Farms or ProPortion will not prevail in all or some of their claims against us, or that we will prevail in some or all of our claims against Don Lee Farms. For example, if Don Lee Farms succeeds in the lawsuit, *we could be required to pay damages, including but not limited to contract damages* reasonably calculated at what we would have paid Don Lee Farms to produce our products through 2019, the end of the contract term, and *Don Lee Farms could also claim some ownership in the intellectual property associated with the production of certain of our products or in the products themselves*, and thus claim a stake in the value we have derived and will derive from the use of that intellectual property after we terminated our supply agreement with Don Lee Farms. As another example, we also could be required to pay attorney's fees and costs incurred by Don Lee Farms or ProPortion.

(Emphasis added.)

101.   The Company's secondary public offering closed on August 5, 2019. In connection with the offering, the Company issued 3,737,500 shares priced at $160.00 per share, and received approximately $38.5 million in proceeds.

### November 12, 2019 Form 10-Q

102.   On November 12, 2019, the Company filed with the SEC its quarterly report for the third fiscal quarter ended September 28, 2019 on Form 10-Q (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendants Brown and Nelson, and contained SOX certifications signed by Defendants Brown and Nelson attesting to the accuracy of the 3Q19 10-Q.

103.   The 3Q19 10-Q stated the following concerning the Don Lee Action:

On May 25, 2017, Don Lee Farms, a division of Goodman Food Products, Inc., filed a complaint against us in the Superior Court of the State of California for the County of Los Angeles asserting claims for breach of contract, misappropriation of trade secrets, unfair competition under the California Business and Professions Code, money owed and due, declaratory relief and injunctive relief, each arising out of our decision to terminate an exclusive supply agreement between us and Don Lee Farms. We deny all of these claims and filed counterclaims on July 27, 2017, alleging breach of contract, unfair competition under the California Business and Professions Code and conversion.

* * *

**On June 19, 2019, we filed an answer denying Don Lee Farms' claims**. Trial is currently set for May 18, 2020.

* * *

**We believe we were justified in terminating the supply agreement with Don Lee Farms, that we did not misappropriate their alleged trade secrets, that we are not liable for the fraud or negligent misrepresentation alleged in the proposed second amended complaint, that Don Lee Farms is liable for the conduct alleged in our cross-complaint, and that we are not liable to ProPortion for any indemnity, contribution, or repayment, including for any damages or attorney's fees and costs. We are currently in the process of litigating this matter and intend to vigorously defend ourselves against the claims**. We cannot assure you that Don Lee Farms or ProPortion will not

prevail in all or some of their claims against us, or that we will prevail in some or all of our claims against Don Lee Farms. For example, if Don Lee Farms succeeds in the lawsuit, *we could be required to pay damages, including but not limited to contract damages* reasonably calculated at what we would have paid Don Lee Farms to produce our products through 2019, the end of the contract term, and *Don Lee Farms could also claim some ownership in the intellectual property associated with the production of certain of our products or in the products themselves*, and thus claim a stake in the value we have derived and will derive from the use of that intellectual property after we terminated our supply agreement with Don Lee Farms. Based on our current knowledge, we have determined that the amount of any material loss or range of any losses that is reasonably possible to result from this lawsuit is not estimable.

(Emphasis added.)

104.    The statements in ¶¶ 93–98 and 100–103 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company's termination of the Supply Agreement had constituted a breach of the agreement, and would foreseeably expose the Company to legal liability, costs, and damage to the Company's reputation; (2) the Company falsely represented the accuracy of a food safety consultant's report provided to Don Lee, which certain Company employees had doctored to, among other things, exclude pertinent safety information; and (3) Beyond Meat failed to maintain internal controls. As a result of the foregoing, Beyond Meat's public statements were materially false and misleading at all relevant times.

## **The Truth Emerges**

105.    After the market closed on January 27, 2020, *Business Wire* published an article titled, "Judge Rules Don Lee Farms Likely to Obtain a Judgment. Beyond Meat's CFO and Others Named Individually for Fraud." The article revealed that the judge in the Don Lee Action had ruled that Don Lee had "proved the probable validity of its claim," stating the following, in relevant part:

A judge has ruled Don Lee Farms proved the probable validity of its claim that Beyond Meat breached its manufacturing agreement with Don Lee Farms. The Court issued a Right to Attach Order. In a separate motion before a different Judge, the Court granted Don Lee Farms' request to name Beyond Meat Chief Financial Officer Mark Nelson, Senior Quality Assurance Manager Jessica Quetsch and Director of Operations Anthony Miller in its fraud claims which allege they intentionally doctored and omitted material information from a food safety consultant's report, and then delivered that doctored report to Don Lee Farms and affirmatively represented that it was the complete opinion of the consultant. The omitted portions discussed significant food safety issues at Beyond Meat's facility.

The next day, Beyond Meat announced it hired new lawyers.

106.  The article further quoted President of Don Lee, Donald Goodman, who stated that "Our claims have been shown to several judges and each one has ruled in our favor." The article also revealed that the Company had lost motions to conceal 147,000 documents from the public.

107.  On this news, the price of the Company's stock dropped from $124.75 per share at the close of trading on January 27, 2020, to $120.12 at the close of trading on January 28, 2020, a drop of approximately 3.71%.

## DAMAGES TO BEYOND MEAT

108.  As a direct and proximate result of the Individual Defendants' conduct, Beyond Meat has lost and expended, and will lose and expend, many millions of dollars.

109.  Such expenditures include, but are not limited to, legal fees associated with the Don Lee Action, the Securities Class Action filed against the Company, its CEO, and its CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

110.  Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and

benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

111.  As a direct and proximate result of the Individual Defendants' conduct, Beyond Meat has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

112.  Plaintiff brings this action derivatively and for the benefit of Beyond Meat to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Beyond Meat, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof.

113.  Beyond Meat is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

114.  Plaintiff is, and has continuously been at all relevant times, a shareholder of Beyond Meat. Plaintiff will adequately and fairly represent the interests of Beyond Meat in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

115.  Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

116.  A pre-suit demand on the Board of Beyond Meat is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Brown, Goldman, Carhart, Lane, van Lengerich, Segal, Stone, Thompson, and Waller (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors that were on the Board at the time this action was commenced.

Verified Shareholder Derivative Complaint

117.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while four of them engaged in insider sales based on material non-public information, netting proceeds of over $34.7 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

118.   In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

119.   Additional reasons that demand on Defendant Brown is futile follow. Defendant Brown is the founder of the Company, and has served as the Company's President and CEO since 2009. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Brown with his principal occupation, and he receives handsome compensation, including $967,994 during fiscal year 2018. Defendant Brown was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the IPO Documents and SPO Documents, which he signed, and in the 1Q19 10-Q, 2Q19 10-Q, and 3Q19 10-Q, which he signed and signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the

scheme, and consciously disregarded his duties to protect corporate assets. Defendant Brown caused the Company to terminate the Supply Agreement, and thus was aware prior to the IPO that such termination would expose the Company to liability in the future. His insider sales before the fraud was exposed, which yielded approximately $7.2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Brown is a defendant in the Securities Class Action. For these reasons, too, Defendant Brown breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

120.   Additional reasons that demand on Defendant Goldman is futile follow. Defendant Goldman serves as Chairman of the Board and has served as a Company director since February 2013 and as Executive Chair from February 2013 to February 2020. Defendant Goldman has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Goldman was on the Company's Board at the time the Company terminated the Supply Agreement, and thus was aware prior to the IPO that such termination would expose the Company to liability in the future. Additionally, Defendant Goldman signed, and thus personally made, the false and misleading statements in the IPO Documents and the SPO Documents. For these reasons, too, Defendant Goldman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

121.   Additional reasons that demand on Defendant Carhart is futile follow. Defendant Carhart has served as a Company director since January 2016, and also serves

as a member of the Audit Committee. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Carhart was on the Company's Board at the time the Company terminated the Supply Agreement, and thus was aware prior to the IPO that such termination would expose the Company to liability in the future. Defendant Carhart also signed, and thus personally made the false and misleading statements in the IPO Documents and the SPO Documents. Her insider sales before the fraud was exposed, which yielded approximately $6.72 million in proceeds, demonstrate her motive in facilitating and participating in the fraud. For these reasons too, Defendant Carhart breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

122.    Additional reasons that demand on Defendant Lane is futile follow. Defendant Lane has served as a Company director since February 2015, and also serves as a member of the Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Lane was on the Company's Board at the time the Company terminated the Supply Agreement, and thus was aware prior to the IPO that such termination would expose the Company to liability in the future. Defendant Lane also signed, and thus personally made the false and misleading statements in the IPO Documents and the SPO Documents. For these reasons too, Defendant Lane breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

123.    Additional reasons that demand on Defendant van Lengerich is futile follow. Defendant van Lengerich has served as a Company director since November 2016. Defendant van Lengerich has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant van Lengerich was on the Company's Board at the time the Company terminated the Supply Agreement, and thus was aware prior to the IPO that such termination would expose the Company to liability in the future. Defendant van Lengerich also signed, and thus personally made the false and misleading statements in the IPO Documents and the SPO Documents. His insider sale before the fraud was exposed, which yielded approximately $11 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons too, Defendant van Lengerich breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

124.    Additional reasons that demand on Defendant Segal is futile follow. Defendant Segal has served as a Company director since November 2018, and also serves as a member of the Audit Committee. Defendant Segal has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Segal also signed, and thus personally made the false and misleading statements in the IPO Documents and the SPO Documents. For these reasons too, Defendant Segal breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

125.   Additional reasons that demand on Defendant Stone is futile follow. Defendant Stone has served as a Company director since January 2012, and also serves as the Chair of the Nominating and Corporate Governance Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Stone was on the Company's Board at the time the Company terminated the Supply Agreement, and thus was aware prior to the IPO that such termination would expose the Company to liability in the future. Defendant Stone also signed, and thus personally made the false and misleading statements in the IPO Documents and the SPO Documents. His insider sales before the fraud was exposed, which yielded approximately $9.86 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons too, Defendant Stone breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

126.   Additional reasons that demand on Defendant Thompson is futile follow. Defendant Thompson has served as a Company director since October 2015, and also serves as the Chair of the Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Thompson was on the Company's Board at the time the Company terminated the Supply Agreement, and thus was aware prior to the IPO that such termination would expose the Company to liability in the future. Defendant Thompson also signed, and thus personally made the false and misleading statements in

the IPO Documents and the SPO Documents. For these reasons too, Defendant Thompson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

127.   Additional reasons that demand on Defendant Waller is futile follow. Defendant Waller has served as a Company director since November 2018, and also serves as the Chair of Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Waller has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Waller also signed, and thus personally made the false and misleading statements in the IPO Documents and the SPO Documents. For these reasons too, Defendant Waller breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

128.   Additional reasons that demand on the Board is futile follow.

129.   As described above, four of the Directors on the Board directly engaged in insider trading, in violation of federal law. Defendants Brown, Carhart, van Lengerich, and Stone collectively received proceeds of over $34.7 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

130.   The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendant Stone is the co-founder and creative director of Twitter, Inc., where

Defendant Segal has served as CFO since 2017. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

131. Defendants Carhart, Segal, and Waller (the "Audit Committee Defendants"), served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the integrity of the Company's financial statements, compliance with legal and regulatory requirements, and matters implicating ethical concerns. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

132. In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

133. Beyond Meat has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Beyond Meat any part of the damages Beyond Meat suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

134.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

135.   The acts complained of herein constitute violations of fiduciary duties owed by Beyond Meat's officers and directors, and these acts are incapable of ratification.

136.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Beyond Meat. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Beyond Meat, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

137.   If there is no directors' and officers' liability insurance, then the Directors will not cause Beyond Meat to sue the Individual Defendants named herein, since, if they

did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

138.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

139.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

140.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Beyond Meat's business and affairs.

141.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

142.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Beyond Meat.

143.   In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

144.   In further breach of their fiduciary duties owed to Beyond Meat, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's termination of the Supply Agreement had constituted a breach of the agreement, and would foreseeably expose the Company to legal liability, costs, and damage to the Company's reputation; (2) the Company falsely represented the

accuracy of a food safety consultant's report provided to Don Lee, which certain Company employees had doctored to, among other things, exclude pertinent safety information; and (3) Beyond Meat failed to maintain internal controls. As a result of the foregoing, Beyond Meat's public statements were materially false and misleading at all relevant times.

145.   The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

146.   In breach of their fiduciary duties, six of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

147.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

148.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available

to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

149.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

150.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Beyond Meat has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

151.   Plaintiff on behalf of Beyond Meat has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

152.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

153.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Beyond Meat.

154.   The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Beyond Meat that was tied to the performance or artificially inflated valuation of Beyond Meat, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

Verified Shareholder Derivative Complaint

155.  Plaintiff, as a shareholder and representative of Beyond Meat, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

156.  Plaintiff on behalf of Beyond Meat has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Waste of Corporate Assets

157.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

158.  As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (such as the Securities Class Action and the Don Lee Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

159.  As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

160.  Plaintiff on behalf of Beyond Meat has no adequate remedy at law.

## FOURTH CLAIM

### Against Defendants Brown and Nelson for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

161.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

162.  Beyond Meat, along with Defendants Brown and Nelson are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the

Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Brown and Nelson's willful and/or reckless violations of their obligations as officers and/or directors of Beyond Meat.

163.   Defendants Brown and Nelson, because of their positions of control and authority as officers and/or directors of Beyond Meat, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Beyond Meat, including the wrongful acts complained of herein and in the Securities Class Action.

164.   Accordingly, Defendants Brown and Nelson are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

165.   As such, Beyond Meat is entitled to receive all appropriate contribution or indemnification from Defendants Brown and Nelson.

## **PRAYER FOR RELIEF**

166.   FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Beyond Meat, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Beyond Meat;

(c)   Determining and awarding to Beyond Meat the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Beyond Meat and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Beyond Meat and its shareholders from a

repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2. a provision to permit the shareholders of Beyond Meat to nominate at least five candidates for election to the Board; and

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

    (e)    Awarding Beyond Meat restitution from the Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action,

///
///
///
///
///
///
///
///
///
///
///
///
///

Verified Shareholder Derivative Complaint

including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## **<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury.

Dated: March 16, 2020                     Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

_____s/Robert C. Moest_____
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Eric Weiner  am a plaintiff in the within action.  I have reviewed the allegations made in this consolidated shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th day of _3/12/2020_, 2020.

DocuSigned by:

_Eric Weiner_
6F30F1ED6F6D458...

Eric Weiner