Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

IN RE: BEYOND MEAT, INC. DERIVATIVE LITIGATION

_____

This Document Relates to:

ALL ACTIONS

Case No.: CV-20-2524-MWF (AFMx)

DEMAND FOR JURY TRIAL

## CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

# **INTRODUCTION**

Plaintiffs Eric Weiner, Kimberly Brink, and Melvyn Klein ("Plaintiffs"), by their undersigned attorneys, derivatively and on behalf of Nominal Defendant Beyond Meat, Inc. ("Beyond Meat" or the "Company"), file this Consolidated Amended Shareholder Derivative Complaint against Individual Defendants Ethan Brown, Mark J. Nelson, Seth Goldman, Gregory Bohlen, Diane Carhart, Raymond J. Lane, Bernhard van Lengerich, Ned Segal, Christopher Isaac "Biz" Stone, Donald Thompson, Kathy N. Waller, Jessica Quetsch, and Anthony Miller (collectively, the "Individual Defendants," and together with Beyond Meat, the "BM Defendants") for breaches of their fiduciary duties as employees, directors and/or officers of Beyond Meat, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and against nearly all of the Individual Defendants for violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against ProPortion Foods, LLC and CLW Foods, LLC (and, together with the Individual Defendants and Beyond Meat, the "Defendants") for aiding and abetting the Individual Defendants' breaches of their fiduciary duties as employees, directors and/or officers of Beyond Meat. As for Plaintiffs' complaint against the Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Beyond Meat, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Beyond Meat's employees, directors, and officers from at least April 2016 through the present (the "Relevant Period") based on fraudulent misconduct, wrongful termination of the Company's co-manufacturing agreement, misappropriation of trade secrets, and other misconduct set forth herein including false assurances in SEC filings that Beyond Meat and its employees, directors, and officers were following the Company's Code of Business Conduct and Ethics ("Code of Conduct")—including, among other things, with respect to the Company's compliance with applicable laws, while acting in opposition to those statements.

2.     Beyond Meat is a provider of plant-based meat products, including beef, pork, and poultry substitutes.  Beyond Meat's most popular offering is the Beyond Burger, a plant-based burger sold in thousands of grocery stores and restaurants internationally.

3.     Prior to changing its corporate name in September 2018, Beyond Meat, was formerly known as a private company called Savage River, Inc. In 2014, Beyond Meat entered into a written exclusive supply agreement, as amended (the "Supply Agreement") with Don Lee Farms, a division of Goodman Food Products, Inc. ("Don Lee"), a manufacturer of plant-based, vegan protein products that was founded in 1982 by its current Chief Executive Officer ("CEO"), Donald Goodman ("Goodman").  Under the terms of the Supply Agreement, Beyond Meat would supply Don Lee with the Company's pea protein-based raw ingredients called "extrudate" which Don Lee would then process and package for distribution and sale.  Don Lee would produce and ship to Beyond Meet all of the food products the Company required, including its famous Beyond Burger.  To do this, Don Lee established a proprietary process for producing the Company's products called the "Batch Making Protocols" which detailed the method and

process for mass-producing Beyond Meat's products, particularly the Beyond Burger, including key factors such as ingredient amounts, mixing times, and equipment layouts.

4.      In early 2016, after Don Lee raised concerns regarding tainted ingredients that it had received from Beyond Meat, the Company's CEO Ethan Brown ("Brown") engaged a food safety consultant to conduct an audit of the Company's Missouri facility to appease Don Lee. Thereafter, the food safety inspector issued a report which reflected the consultant's findings of contamination.  However, Beyond Meat falsely represented the accuracy of the food safety consultant's report provided to Don Lee, which certain Company employees including Defendants Mark J. Nelson ("Nelson"), Jessica Quetsch ("Quetsch"), and Anthony Miller ("Miller") coordinated to doctor, alter, and exclude pertinent safety information (the "Fraudulent Misconduct").

5.      Soon after the Company launched the Beyond Burger in May 2016, Beyond Meat began its search to replace Don Lee as its co-manufacturer under more favorable, i.e., less costly, terms. Indeed, Beyond Burger had scheduled a test with CLW Foods, LLC ("CLW") for February 3, 2017, to determine whether it could handle the role of co-manufacturer.  When Don Lee inevitably found out, Defendant Brown attempted to mitigate the damage by representing that he had cancelled the test. Instead, however, Beyond Meat continued to negotiate with CLW and by April 12, 2017 had sent design drawings illustrating how CLW should begin to set up the equipment in its facility to produce the Company's products.  That same day, Beyond Meat sent Don Lee a Notice of Breach alleging various food safety violations in Don Lee's Texas facility.  Thereafter, on May 23, 2017, Beyond Meat terminated the Supply Agreement, and began shifting its production to other manufacturers including CLW and ProPortion Foods, LLC ("ProPortion") in violation of the exclusive Supply Agreement which CLW and ProPortion were aware of (collectively the "Wrongful Termination").  Notably, despite having no prior experience mass-producing plant-based protein products, CLW and ProPortion, the Company's current co-manufacturers, were up and running within weeks

Consolidated Amended Shareholder Derivative Complaint

using a nearly identical process as Don Lee's propriety Batch Making Protocol, a trade secret which the Company, CLW, and ProPortion had misappropriated in violation of applicable laws and the non-disclosure agreement contained in the exclusive Supply Agreement (the "Misappropriation").

6.      Moreover, the Company failed to compensate Don Lee for delivered product, furnish Don Lee with equipment, parts, and labor at its sole cost and expense under the Supply Agreement, service and repair such equipment, furnish Don Lee with effective and adequate equipment, and furnish Don Lee with personnel required in connection with various certifying agency requirements as set forth in the Supply Agreement.

7.      Don Lee filed suit against Beyond Meat in the Superior Court of the State of California for the County of Los Angeles alleging, among other things, breach of contract, misappropriation of trade secrets, unfair competition, and fraud, captioned *Don Lee Farms v. Savage River, Inc.*, Case No. BC662838 (Cal. Super. Ct.) (the "Don Lee Action").  Notably, on January 24, 2020, the court in the Don Lee Action granted Don Lee a right to attach in the amount of $628,689 on the grounds that Don Lee had established a "probable validity" of its claim that Beyond Meat owes Don Lee money for unpaid invoices.

8.      In breach of their fiduciary duties, the Individual Defendants either engaged in and/or permitted, and/or allowed the Company to engage in the Fraudulent Misconduct, Wrongful Termination, and/or Misappropriation.

9.      During the Relevant Period, the Individual Defendants further breached their fiduciary duties by personally making and/or causing Beyond Meat to make materially false and misleading statements in the Schedule 14A filed with the SEC on April 10, 2020 (the "2020 Proxy Statement") which failed to disclose, inter alia, that in violation of the Code of Conduct: (1) the Company had engaged in the Fraudulent Misconduct; (2) the Company had engaged in the Wrongful Termination; (3) the Company had engaged

in the Misappropriation, which was ongoing; and (4) the Company failed to maintain adequate internal controls.

10.     During the Relevant Period, the Individual Defendants continued to breach their fiduciary duties by failing to correct and causing Beyond Meat to fail to correct these false and misleading statements and omissions of material fact to the investing public.

11.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Beyond Meat to fail to maintain adequate internal controls.

12.     In addition, by including false and misleading statements concerning the Company's compliance with the Code of Conduct in the 2020 Proxy Statement, nearly all of the Individual Defendants violated Section 14(a) of the Exchange Act.

13.     In light of the Individual Defendants' misconduct, which has subjected Beyond Meat and certain of its employees and officers to being named as defendants in the Don Lee Action, the need to undertake internal investigations, the need to implement adequate internal controls, the losses to Beyond Meat from the over-compensation by the Company of the Individual Defendants, Beyond Meat will have to expend millions of dollars.

14.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct, and the aiding and abetting thereof.

15.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are Beyond Meat's current directors, their collective engagement in misconduct, the substantial likelihood of the directors' liability in this derivative action and the CFO's, former Senior Quality Assurance Manager's, and former Director of Operation's liability in the Don Lee Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their

not being disinterested and/or independent directors, a majority of Beyond Meat's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of Beyond Meat with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

17.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

18.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation or limited liability company doing business in California, or he or she is an individual who has minimum contacts with California to justify the exercise of jurisdiction over them.

20.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

21.    Venue is proper in this District because Beyond Meat and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiffs

22.    Plaintiff Weiner is a current shareholder of Beyond Meat common stock and has continuously held Beyond Meat common stock at all relevant times.

Consolidated Amended Shareholder Derivative Complaint

23.    Plaintiff Brink is a current shareholder of Beyond Meat common stock and has continuously held Beyond Meat common stock at all relevant times.

24.    Plaintiff Klein is a current shareholder of Beyond Meat common stock and has continuously held Beyond Meat common stock at all relevant times.

### Nominal Defendant Beyond Meat

25.    Beyond Meat is a Delaware corporation with its principal executive offices located at 119 Standard Street, El Segundo, California 90245. Beyond Meat's shares trade on NASDAQ under the ticker symbol "BYND."

### Defendant Brown

26.    Defendant Brown is the founder of the Company and has served as the Company's President and CEO since 2009. According to the 2020 Proxy Statement, as of March 23, 2020, Defendant Brown beneficially owned 3,381,883 shares of Beyond Meat's common stock, which represented 5.3% of Beyond Meat's outstanding shares of common stock on that date. Given that the price per share of Beyond Meat's common stock at the close of trading on March 23, 2020 was $57.55, Defendant Brown owned approximately $194.6 million worth of Beyond Meat stock.

27.    For the fiscal year ended December 31, 2019, Defendant Brown received $8,010,451 in compensation from Beyond Meat. This included $500,000 in salary, $7,257,451 in option awards, $250,000 in non-equity incentive plan compensation, and $3,000 in all other compensation.  For the fiscal year ended December 31, 2018, Defendant Brown received $967,994 in compensation from Beyond Meat. This included $298,750 in salary, $524,244 in option awards, and $145,000 in non-equity incentive plan compensation.  For the fiscal year ended December 31, 2017, Defendant Brown received $413,489 in compensation from Beyond Meat. This included $288,789 in salary and $124,700 in non-equity incentive plan compensation.

**Defendant Nelson**

28.    Defendant Nelson served as Beyond Meat's CFO since May 2017, and as Treasurer since September 2018. Previously, he served as Beyond Meat's Chief Operating Officer from May 2017 through September 2018, and as Secretary from September 2018 through May 2019.  On February 26, 2021, Defendant Nelson informed the Company of his intention to retire, and did retire, from employment with the Company effective May 5, 2021.   In consideration for his retirement, Defendant Nelson received a $1,000 lump sum payment and the Company will pay the costs of monthly COBRA premiums for him and his dependents for up to 18 months.  However, Defendant Nelson will serve as a consultant to the Company starting on May 6, 2021 until May 5, 2023.

29.    For the fiscal year ended December 31, 2018, Defendant Nelson received $610,758 in compensation from Beyond Meat. This included $326,666 in salary, $121,591 in option awards, and $162,501 in non-equity incentive plan compensation. For the fiscal year ended December 31, 2017, Defendant Nelson received $404,378 in compensation from Beyond Meat. This included $287,336 in salary and $117,042 in non-equity incentive plan compensation.

**Defendant Goldman**

30.    Defendant Seth Goldman ("Goldman") has served as a Company director since February 2013 and is Chairman of the Board. He also served as Executive Chair of the Company from February 2013 until February 2020. According to the 2020 Proxy Statement, as of March 23, 2020, Defendant Goldman beneficially owned 1,080,722 shares of Beyond Meat's common stock, which represented 1.7% of Beyond Meat's outstanding shares of common stock on that date. Given that the price per share of Beyond Meat's common stock at the close of trading on March 23, 2020 was $57.55, Defendant Goldman owned approximately $62.2 million worth of Beyond Meat stock.

31.     For the fiscal year ended December 31, 2019, Defendant Goldman received $1,773,445 in compensation from Beyond Meat. This included $1,409,661 in option awards, $121,260 in non-equity incentive plan compensation, and $242,524 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Goldman received $175,000 in compensation from Beyond Meat, which consisted entirely of fees paid for consulting services.

### Defendant Bohlen

32.     Defendant Gregory Bohlen served as a Beyond Meat director from February 2013 until he resigned on October 23, 2019.

### Defendant Carhart

33.     Defendant Diane Carhart ("Carhart") has served as a Company director since January 2016, and also serves and has served as a member of the Audit Committee since at least 2019. According to the 2020 Proxy Statement, as of March 23, 2020, Defendant Carhart beneficially owned 28,436 shares of Beyond Meat's common stock. Given that the price per share of Beyond Meat's common stock at the close of trading on March 23, 2020 was $57.55, Defendant Carhart owned approximately $1.6 million worth of Beyond Meat stock.

34.     For the fiscal year ended December 31, 2019, Defendant Carhart received $31,688 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

### Defendant Lane

35.     Defendant Raymond J. Lane ("Lane") has served as a Beyond Meat director since February 2015 and also serves, and has served, as a member of the Human Capital Management and Compensation Committee since at least 2019. According to the 2020 Proxy Statement, as of March 23, 2020, Defendant Lane beneficially owned 259,962 shares of Beyond Meat's common stock. Given that the price per share of Beyond Meat's

Consolidated Amended Shareholder Derivative Complaint

common stock at the close of trading on March 23, 2020 was $57.55, Defendant Lane owned approximately $15 million worth of Beyond Meat stock.

36.   For the fiscal year ended December 31, 2019, Lane received $35,358 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

### Defendant van Lengerich

37.   Defendant Bernhard van Lengerich ("van Lengerich") has served as a Company director since November 2016. According to the 2020 Proxy Statement, as of March 23, 2020, Defendant van Lengerich beneficially owned 10,133 shares of Beyond Meat's common stock. Given that the price per share of Beyond Meat's common stock at the close of trading on March 23, 2020 was $57.55, Defendant van Lengerich owned approximately $583,154 million worth of Beyond Meat stock.

38.   For the fiscal year ended December 31, 2019, Defendant van Lengerich received $146,685 in compensation from Beyond Meat.  This included $26,685 in fees earned or paid in cash, $120,000 in all other compensation. For the fiscal year ended December 31, 2018, Defendant van Lengerich received $120,000 in compensation from Beyond Meat, which consisted entirely of fees paid for consulting services.

### Defendant Segal

39.   Defendant Ned Segal ("Segal") has served as a Company director since November 2018, and also serves, and has served, as a member of the Audit Committee since at least 2019. According to the 2020 Proxy Statement, as of March 23, 2020, Defendant Segal beneficially owned 21,734 shares of Beyond Meat's common stock. Given that the price per share of Beyond Meat's common stock at the close of trading on March 23, 2020 was $57.55, Defendant Segal owned approximately $1.3 million worth of Beyond Meat stock.

40.   For the fiscal year ended December 31, 2019, Defendant Segal received $31,688 in compensation from the Company, which consisted entirely of fees earned or paid in cash. For the fiscal year ended December 31, 2018, Defendant Segal received

Consolidated Amended Shareholder Derivative Complaint

$149,522 in compensation from Beyond Meat, which consisted entirely of option awards.

**Defendant Stone**

41.    Defendant Christopher Isaac "Biz" Stone ("Stone") has served as a Company director since January 2012, and also serves, and has served, as the Chair of the Nominating and Corporate Governance Committee since at least 2019. According to the 2020 Proxy Statement, as of March 23, 2020, Defendant Stone beneficially owned 226,390 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 23, 2020 was $57.55, Defendant Stone owned approximately $13 million worth of Beyond Meat stock.

42.    For the fiscal year ended December 31, 2019, Defendant Stone received $32,022 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

**Defendant Thompson**

43.    Defendant Donald Thompson ("Thompson") has served as a Company director since October 2015, and also serves, and has served, as the Chair of the Human Capital Management and Compensation Committee since at least 2019. According to the 2020 Proxy Statement, as of March 23, 2020, Defendant Thompson beneficially owned 816,132 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2020 was $57.55, Defendant Thompson owned approximately $47 million worth of Beyond Meat stock.

44.    For the fiscal year ended December 31, 2019, Defendant Thompson received $33,356 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

**Defendant Waller**

45.    Defendant Kathy N. Waller ("Waller") has served as a Company director since November 2018, and also serves, and has served, as the Chair of Audit Committee and as a member of the Nominating and Corporate Governance Committee since at least

Consolidated Amended Shareholder Derivative Complaint

2019. According to the 2020 Proxy Statement, as of March 23, 2020, Defendant Waller beneficially owned 17,234 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2020 was $57.55, Defendant Waller owned approximately $1 million worth of Beyond Meat stock.

46.     For the fiscal year ended December 31, 2019, Defendant Waller received $38,922 in compensation from the Company, which consisted entirely of fees earned or paid in cash.  For the fiscal year ended December 31, 2018, Defendant Waller received $149,522 in compensation from the Company, which consisted entirely of option awards.

## Defendant Quetsch

47.     Defendant Jessica Quetsch ("Quetsch") has served as the Company's Customer Compliance Document, Senior Manager since April 2020.  Previously, she served as the Company's Customer Compliance, Document Manager from January 2019 until April 2020, as the Co-Manufacturing Quality Assurance Manager from July 2018 until December 2018, as the Quality Manager, Manufacturing from December 2017 until July 2018, as a Senior Food Scientist from July 2017 until December 2017, as the Senior Quality Assurance Manager from April 2016 until July 2017, and as a Quality Assurance Manager, SQF Practitioner from January 2014 until July 2017.

## Defendant Miller

48.     Defendant Anthony Miller ("Miller") served as the Company's Director of Operations from July 2015 until September 2016.

## Defendant ProPortion

49.     ProPortion Foods, LLC ("ProPortion") is a limited liability company, headquartered in Round Rock, Texas and was acquired by Cargill in December 2020. ProPortion served as one of Beyond Meat's co-manufacturers after the Wrongful Termination.

## Defendant CLW

Consolidated Amended Shareholder Derivative Complaint

50.     CLW Foods, LLC ("CLW")[1] is a limited liability company, headquartered in Hanford, California.  CLW served as one of Beyond Meat's co-manufacturers after the Wrongful Termination.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

51.     By reason of their positions as officers, directors, and/or fiduciaries of Beyond Meat and because of their ability to control the business and corporate affairs of Beyond Meat, the Individual Defendants owed Beyond Meat and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Beyond Meat in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Beyond Meat and its shareholders so as to benefit all shareholders equally.

52.     Each director and officer of the Company owes to Beyond Meat and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

53.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Beyond Meat, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

54.     To discharge their duties, the officers and directors of Beyond Meat were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

---

[1] Although ProPortion and CLW are incorporated as distinct entities, Don Ephgrave ("Ephgrave"), the Company's former Vice President of Operations and Supply Chain from 2016 to 2017, testified in the federal securities class action filed in the Central District of California captioned *Tran v. Beyond Meat, Inc., et al.*, Case No.: 2:20-cv-00963 that ProPortion and CLW are essentially alter egos of each other and that the two entities had the same owner.

55.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Beyond Meat, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Beyond Meat's Board at all relevant times.

56.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

57.     To discharge their duties, the officers and directors of Beyond Meat were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Beyond Meat were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and

prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Beyond Meat's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Beyond Meat conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Beyond Meat and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Beyond Meat's operations would comply with all applicable laws and Beyond Meat's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make

full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

58.     Each of the Individual Defendants further owed to Beyond Meat and the shareholders the duty of loyalty requiring that each favor Beyond Meat's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

59.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Beyond Meat and were at all times acting within the course and scope of such agency.

60.     Because of their advisory, executive, managerial, and directorial positions with Beyond Meat, each of the Individual Defendants had access to adverse, non-public information about the Company.

61.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Beyond Meat.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION BY THE INDIVIDUAL DEFENDANTS

62.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

63.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the

Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets.

64.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Beyond Meat was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

65.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

66.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Beyond Meat and was at all times acting within the course and scope of such agency.

## BEYOND MEAT'S CODE OF CONDUCT

67.     The Company's Code of Conduct states that it "provide[s] guidance applicable to all members of the Company's Board of Directors ("Board") and officers, employees, independent contractors and consultants of the Company (all such persons for purposes of this Code, "employees"))," and that the Company "is committed to promoting

high standards of honest and ethical business conduct and compliance with applicable laws, rules and regulations."

68. The Code of Conduct also states that it the Company "expects all of its directors, executives, managers and other supervisory personnel to act with honesty and integrity."

69. In a section titled, "Competition and Fair Dealing," the Code of Conduct states the following, in relevant part:

> The Company strives to compete vigorously and to gain advantages over its competitors through superior business performance, not through unethical or illegal business practices. No employee may through improper means acquire proprietary information from others, possess trade secret information or induce disclosure of confidential information from past or present employees of other companies. If an employee becomes aware of the improper acquisition of this type of information, the employee should report it immediately.
>
> Employees are expected to deal fairly and honestly with anyone with whom they have contact in the course of performing their duties to the Company. The making of false or misleading statements about the Company's competitors is prohibited by this Code, inconsistent with the Company's reputation for integrity and harmful to the Company's business. Employees may not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misuse of confidential information, misrepresentation of material facts or any other unfair business practice.

70. In a section titled, "Confidentiality," the Code of Conduct states the following, in relevant part:

> Employees must not share confidential Company information, or any confidential information of a business partner, supplier or vendor with anyone who has not been authorized to receive it, except when disclosure is authorized or legally mandated. Unauthorized use or distribution of this information is extremely serious; it would violate the confidential information and invention assignment agreement or similar agreement (including consulting or contractor agreement) and it could be illegal and result in civil liability or criminal penalties. It would also violate the

Consolidated Amended Shareholder Derivative Complaint

Company's trust in an employee, and the trust of a business partner, supplier or vendor in the Company.

71.     In a section titled, "Compliance Standards and Procedures," the Code of Conduct states the following, in relevant part:

> If an employee is aware of a suspected or actual violation of this Code by others, it is the employee's responsibility to report it. Employees and directors must make an immediate report of any suspected or actual violations (whether or not based on personal knowledge) of applicable law or regulations or the Anti-Corruption Policy.

72.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Fraudulent Misconduct, Wrongful Termination, and/or Misappropriation (which the Individual Defendants engaged in and/or permitted despite being aware of it), or the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, abuse of control, gross mismanagement, and violations of the Exchange Act. Also in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## ADDITIONAL CORPORATE GOVERNANCE

### Audit Committee Charter

73.     Beyond Meat maintains an Audit Committee Charter. This charter describes the responsibilities of this committee and provides in relevant part:

> At least annually, obtain and review a report by the independent auditor describing: the firm's internal quality-control procedures; any material issues raised by the most recent internal quality-control review, or peer review, of the firm…
>
> ***
>
> On behalf of the Board, oversee the principal risk exposures facing the Company and the Company's mitigation efforts in respect of such risks,

including, but not limited to financial reporting risks and credit and liquidity risks.

***

Meet with management and the independent auditor to discuss … significant issues encountered in the course of the audit work, including: … the adequacy of internal controls…

Periodically receive reports from management regarding, and review and discuss the adequacy and effectiveness of, the Company's disclosure controls and procedures.

***

Periodically conduct separate executive sessions with management and the independent auditor to discuss matters that any of them or the Committee believes could significantly affect the financial statements and should be discussed privately; and review with the independent auditor any audit problems or difficulties and management's response, including any restrictions on the scope of the independent auditor's activities or access to requested information, or any significant disagreements with management.

***

Review with the full Board, any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditor, and the performance of the internal audit function, if applicable.

**Human Capital Management and Compensation Committee Charter**

74.     Beyond Meat maintains a Human Capital Management and Compensation Committee Charter. This charter describes the responsibilities of this committee and provides in relevant part:

The Committee shall review the Company's employee compensation policies and practices at least annually to assess the adequacy in promoting the long-term interests of the Company and its stockholders and to further assess whether such compensation policies and practices create risks that are reasonably likely to have a material adverse effect on the Company.

***

With respect to "executive officers" (as defined in Rule 3b-7 under the Exchange Act) and "officers" (as defined in Rule 16a-1(f) under the Exchange Act) of the Company, other than the Company's CEO (the "Other Executive Officers"), the Committee has authority to determine the amount

and form of compensation paid to the Other Executive Officers, and to take such action, and to direct the Company to take such action, as is necessary and advisable to compensate the Other Executive Officers in a manner consistent with its determinations. The Committee, in consultation with the CEO, will review and approve corporate goals and objectives relevant to the Other Executive Officers' compensation at least annually, evaluate the Other Executive Officers' performance in light of such goals and objectives, including the relationship of such compensation to corporate performance, and based on such evaluation determine the level of the Other Executive Officers' compensation and incentive-compensation and equity-based plan awards.

\*\*\*

The Committee shall have the authority to review and approve any employment, change in control, severance or termination agreement, plan or arrangement to be entered into with the Company's CEO or any Other Executive Officer, which includes the ability to adopt, amend and terminate such agreement, plan or arrangement.

\*\*\*

The Committee shall annually review the potential risk to the Company from its compensation programs and policies, including any incentive plans, and whether such programs and policies incentivize unnecessary and excessive risk taking.

# **INDIVIDUAL DEFENDANTS' MISCONDUCT**

## **Background**

75.    Beyond Meat is a California-based food company that offers a variety of plant-based meat products, including vegan beef, pork, and poultry. The Company was founded in 2009. The Company was formerly known as Savage River, Inc. It changed its name to Beyond Meat in September 2018. Beyond Meat's most successful product is the Beyond Burger, a popular vegan burger sold in thousands of grocery stores and restaurants across the U.S., Canada, and several other countries. Leading up to the Company's IPO in 2019, the Beyond Burger accounted for approximately 60% of the Company's revenue.  As such, Beyond Meat's sale of plant-based meat products, and in particular the Beyond Burger, is its core business.

76.     Historically, Beyond Meat has made use of co-manufacturers to process and package the Company's products, including the Beyond Burger, which Beyond Meat then distributes and markets.

77.     In May 2019, Beyond Meat conducted its IPO.  The IPO was initiated on May 2, 2019. Beyond Meat issued 11,068,750 shares priced at $25.00 per share.  Beyond Meat raised over $240 million.  Beyond Meat's stock began trading at $46 per share and surged to nearly $73 per share by the open of the following trading day.  In large part due to the Company's Beyond Burger as well as Don Lee's mass production of the Beyond Burger, the IPO was "the biggest-popping IPO for a U.S. company that raised more than $200 million since 2000[.]"[2]

78.     On December 2, 2014, Beyond Meat entered into the Supply Agreement with Don Lee, a producer of plant-based meat substitutes and other food products. On April 11, 2016, Beyond Meat and Don Lee entered into the first amendment to the supply agreement.  Under this amendment, Don Lee became the exclusive co-manufacturer for Beyond Meat's products, including the Beyond Burger which launched in May 2016.

79.     Pursuant to the Supply Agreement Don Lee would produce, test, and ship to Beyond Meat all of Beyond Meat's product offerings, including Beyond Meat's flagship product, the Beyond Burger.

80.     The Supply Agreement remained in place for approximately three years until May 23, 2017, a year after the launch of the Beyond Burger, when Beyond Meat wrongfully terminated the Supply Agreement, citing Don Lee's purported failure to rectify certain alleged breaches of the agreement.

81.     Two days later, on May 25, 2017, Don Lee commenced the Don Lee Action, which remains ongoing as of the date of filing this consolidated amended complaint, asserting claims against Beyond Meat for, *inter alia*, breach of contract, misappropriation

---

[2] https://www.marketwatch.com/story/beyond-meat-soars-163-in-biggest-popping-us-ipo-since-2000-2019-05-02 (last visited May 26, 2020).

Consolidated Amended Shareholder Derivative Complaint

of trade secrets, and unfair competition arising out of Beyond Meat's termination of the Supply Agreement.

82.    On January 24, 2020, a writ judge granted Don Lee a right to attach in the amount of $628,689 on the grounds that Don Lee had established a "probable validity" of its claim that Beyond Meat owes Don Lee money for unpaid invoices.

**The Misconduct**

83.    The Individual Defendants engaged in, permitted and/or maintained, and caused the Company to engage in the Fraudulent Misconduct, Wrongful Termination, and/or Misappropriation. The Individual Defendants allowed multiple violations of Beyond Meat's corporate governance policies to occur that injured the Company. These violations included, but were not limited to, engaging in and/or permitting the Fraudulent Misconduct, Wrongful Termination, and/or Misappropriation and engaging in or allowing widespread violations of the Company's Code of Conduct as alleged herein. The Fraudulent Misconduct, Wrongful Termination, and/or Misappropriation resulted in, among other things, adverse news reports, costly litigation, including the Don Lee Action, Defendant Miller's departure, and Defendant Nelson's resignation effective May 5, 2021.

***Failure to Maintain Safety Protocols and Fraudulent Misconduct***

84.    Fraudulent Misconduct, as more fully described herein, includes Beyond Meat's false representations of the accuracy of the food safety consultant's report provided to Don Lee, which certain Company employees including Defendants Nelson, Quetsch, and Miller coordinated to doctor, alter, and exclude pertinent safety information.

85.    In 2016, after discovering foreign objects such as a blue plastic spoon in the Company's shipments of its ingredients, Don Lee's Quality Assurance Manager, Gerber Alvarado ("Alvarado") sent an email to Defendant Quetsch to inform Beyond Meat of Don Lee's finding. Alvarado's email stated, "[a]re you aware of how many foreign

objects we have found? We need to halt operations until satisfactory corrective action has been put in place."

86.     Thereafter, Defendant Brown promised Goodman that the Company would address Beyond Meat's lax safety protocols which led to repeated shipments of tainted raw materials to Don Lee. To that end, the Company engaged an independent food safety consultant to inspect its manufacturing plant located in Columbia, Missouri. After the inspection, Beyond Meat provided Don Lee with the report that purportedly showed no safety issues at the facility.

87.     As a result, on April 11, 2016, Don Lee agreed to enter into the first amendment to the Supply Agreement which significantly expanded the scope of the parties' agreement. Specifically, the amendment extended the contract through April 11, 2019 and more than doubled the Company's minimum required purchases to 4,000,000 pounds of product in the first year, increasing to 5,000,000 and 6,000,000 pounds the second and third years, respectively.

88.     However, Don Lee later discovered that Defendants Nelson, Quetsch, and Miller engaged in a coordinated and fraudulent scheme to alter or doctor the food safety inspector's report to falsely convince Don Lee that Beyond Meat's facility did not suffer from any food safety violations and that its concern was frivolous. Defendants Nelson, Quetsch, and Miller deleted significant and material portions of the safety report which contained the inspector's complete and true findings—that Beyond Meat's ingredients were contaminated.

### *Wrongful Termination and Misappropriation*

89.     Wrongful Termination, as more fully described herein, relates to Beyond Meat's termination of its Supply Agreement with Don Lee on May 23, 2017.

90.     Misappropriation, as more fully described herein, relates to Beyond Meat shifting its production to other manufacturers including CLW and ProPortion where they used a nearly identical process as Don Lee's propriety Batch Making Protocol, a trade

secret which the Company, CLW, and ProPortion had misappropriated in violation of applicable laws and the non-disclosure agreement contained in the exclusive Supply Agreement.

91.    Seeking more favorable contract terms,[3] despite Beyond Meat's exclusive Supply Agreement with Don Lee, in or about January 2017, the Company's executives secretly set up a trial with CLW to determine whether or not CLW could handle Don Lee's demanding task. Moreover, according to a sworn statement submitted in the Don Lee Action from one of ProPortion's Partners, Brian Levy, the Company also approached ProPortion during January 2017 as well.

92.    However, on February 1, 2017, Ephgrave inadvertently sent an email to Goodman which stated, "[w]e are testing this Friday at CLW. If all goes wetland [sic], it meets everyone's expectations, I don't see why we could not be up and running within two to three weeks."

93.    As a result, Goodman alerted Defendant Brown that Don Lee viewed the test with CLW as a breach of the Supply Agreement and demanded Beyond Meat stop engaging with other manufacturers.

94.    The following day, on February 2, 2017, Defendant Brown attempted to smooth things over with Don Lee stating that though the Company and Don Lee have "differ[ing] views of the contract," such as "whether or not [the Company] can produce our core product (fresh beef) elsewhere until [Don Lee is] ready," Beyond Meat would cancel the test with CLW for the "health" of the relationship.  Additionally, Defendant Brown proposed a meeting with Goodman to bury the hatchet, describing his proposal as "very sincere and a reflection on what [Defendant Brown] hope[s] is a mutual respect for one another."

---

[3] Ephgrave testified that the Company believed the minimum purchases required by the Supply Agreement to be excessive.

Consolidated Amended Shareholder Derivative Complaint

95.     Notwithstanding Defendant Brown's "very sincere" offer, Beyond Meat started negotiations with CLW, according to Ephgrave who testified that he had "already been talking to CLW for a while" by late March 2017, that he took a tour of CLW's plant, and that on April 12, 2017, he instructed the Company's Senior Director of Process Engineering, Sergio Jimenez-Marquez, to forward design drawings in connection with the manufacturing of Beyond Meat products to CLW for its facility.

96.     As a pretext to end the relationship, Beyond Meat set a plan in motion to get out of the costly Supply Agreement and replace Don Lee with a cheaper option. Thus, as a result, also on April 12, 2017, the Company sent Don Lee a Notice of Breach citing various issues regarding Don Lee's food safety protocols. Specifically, the Company suddenly alleged that it had discovered wood fragments and other foreign objects in Don Lee's finished products and other unclean conditions including bacteria. Shortly thereafter, on May 3, 2017, more product at Don Lee's facility allegedly tested positive for Salmonella. A few days later, on May 8, 2017, the Company's inspection of Don Lee's facility in Mansfield, Texas, allegedly revealed that the plant was supposedly contaminated with Salmonella. Then, less than a month later, on May 23, 2017, the Company sent Don Lee a Notice of Termination.

97.     Within weeks of the Company's Wrongful Termination of its exclusive Supply Agreement with Don Lee, ProPortion and CLW were producing Beyond Meat's products, including the Beyond Burger, even though neither had any previous experience mass-producing plant-based, substitute-meat protein products. Moreover, the method that ProPortion was utilizing to manufacture the Company's products was nearly indistinguishable from the Batch Making Protocol—Don Lee's proprietary process for mass-producing the Beyond Burger, including critical components such as ingredient portions, mixing times, and equipment layouts. Beyond Meat had engaged in the misappropriation of Don Lee's proprietary trade secrets.

***Additional Misconduct***

98.    Additionally, the Individual Defendants breached their duty to Beyond Meat by engaging in, permitting, and/or causing the Company to: (1) fail to compensate Don Lee for delivered product;[4] (2) fail to furnish Don Lee with equipment, parts, and labor at its sole cost and expense under the Supply Agreement; (3) fail to service and repair such equipment; (4) furnish Don Lee with defective and/or inadequate equipment; and (5) fail to furnish Don Lee with personnel required in connection with various certifying agency requirements as set forth in the supply agreement.

### *Individual Defendants Knowledge of Misconduct*

99.    The misconduct alleged herein concerns the Company's core operations.

100.   The Company's revenue is entirely generated out of the production and commercialization of Beyond Meat's plant-based, alternative meat products.

101.   Don Lee was the Company's exclusive co-manufacturer for approximately three years from December 2014 until the Wrongful Termination in May 2017. Accordingly, Don Lee was responsible for processing and packaging all of the Company's plant-based products. Moreover, Don Lee had a large role in the advancement and manufacturing of the Company's flagship product, the Beyond Burger, for which Don Lee developed a proprietary Batch Making Protocol to mass produce the product which played a large role in maximizing Beyond Meat's success.

102.   The Beyond Burger made up nearly half of the Company's gross revenue in 2017, approximately 70% of the Company's gross revenue in 2018, and about 64% of the Company's gross revenue in 2019. The Company specifically recognized how critical Beyond Burger was to its business in its annual reports filed with the SEC in March 2020 and March 2021, stating: "[w]e believe that sales of the Beyond Burger will continue constitute a significant portion of our revenues, income and cash flow for the foreseeable future."

---

[4] The court in the Don Lee Action granted Don Lee a right to attach in the amount of $628,689 on the grounds that Don Lee had established a "probable validity" of its claim that Beyond Meat owes Don Lee money for unpaid invoices.

103.   In March 2020, the Company also stated that "[r]esearch and development and innovation are core elements of our business strategy, as we believe they represent a critical competitive advantage for us." In March 2021, the Company similarly stated that "[r]esearch, development and innovation are core elements of our business strategy, and we believe they represent a critical competitive advantage for us."

104.   Additionally, Defendant Brown described the Beyond Burger, as the Company's "core product" in an email exchange with Goodman on February 2, 2017.

105.   Moreover, Defendant Brown signed the Supply Agreement and the amendments thereto and also had actual knowledge of the Wrongful Termination of that agreement. Moreover, he had knowledge of the exclusive nature of the agreement. Further, Defendant Brown had actual knowledge of the Company's food safety failures that led to the Fraudulent Misconduct carried out by, Defendants Nelson, Quetsch, and Miller. As Defendant Brown directed the hiring of the food safety consultant to assuage Don Lee's concerns, he either had actual knowledge of or recklessly disregarded the inspection's outcome, the follow-up communications with Don Lee regarding the report, and the fraudulent scheme to deceive Don Lee. Further, Defendant Brown knew or should have known of the Misappropriation as well since he undoubtedly engaged with ProPortion and CLW and likely signed the Company's agreements with them too.

106.   Therefore, Don Lee's critical and exclusive part in co-manufacturing Beyond Meat's plant-based meat products, as well as its key part in the advancement of the Company's most successful products, like the popular Beyond Burger, creates a clear inference that the Individual Defendants knew or recklessly disregarded that the Company engaged in the Fraudulent Misconduct, the Wrongful Termination, and the Misappropriation and that their statements regarding their compliance with the Company's Code of Conduct in light of the misconduct alleged herein, were materially false and misleading or omitted material facts.

### **False and Misleading Statements**

*April 10, 2020 Proxy Statement*

107.  On April 10, 2020, the Company filed the 2020 Proxy Statement. Defendants Brown, Nelson, Goldman, Carhart, Lane, van Lengerich, Segal, Stone, Thompson, and Waller solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[5]

108.  With respect to the Company's Code of Conduct, the 2020 Proxy Statement stated, "[w]e have adopted a written code of business conduct and ethics that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, contractors and consultants." Additionally, the 2020 Proxy Statement further provided "Our code of business conduct and ethics addresses items such as … legal compliance … competition and fair dealing[.]" Moreover, the 2020 Proxy Statement touted the Company's "[r]obust code of business conduct and ethics and corporate governance guidelines."

109.  The 2020 Proxy Statement also called for shareholder approval of, among other things, the election of three directors to the Board.

110.  The 2020 Proxy Statement made multiple references to the Company's annual report for the fiscal year ended December 31, 2019 and filed with the SEC on Form 10-K on March 19, 2020 (the "2019 Annual Report") and information contained in the 2019 Annual Report.  As a consequence, the Individual Defendants knew or should have known that Plaintiffs and the investing public would rely on the information, and/or intended that they rely on information contained in the 2019 Annual Report (and other

---

[5] Plaintiffs' allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiffs specifically disclaim any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Consolidated Amended Shareholder Derivative Complaint

public filings by the Company) in addition to information to information contained in the 2020 Proxy Statement.

111.   The 2020 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

112.   The 2020 Proxy Statement also failed to disclose, inter alia, that in violation of the Code of Conduct: (1) the Company had engaged in the Fraudulent Misconduct; (2) the Company had engaged in the Wrongful Termination; (3) the Company had engaged in the Misappropriation, which was ongoing; and (4) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

113.   As a result of the material misstatements and omissions contained in the 2020 Proxy Statement, Company shareholders elected Defendants Goldman, Stone, and Waller to the Board, which allowed them to continue engaging in and/or permitting the Misappropriation and to continue breaching their fiduciary duties to Beyond Meat. Notably, Defendant Waller was Chairman of the Audit Committee continuously since at least 2019, with all of that committee's oversight responsibilities, as alleged herein.

## DAMAGES TO BEYOND MEAT

114.   As a direct and proximate result of the Individual Defendants' conduct, Beyond Meat has lost and expended, and will lose and expend, many millions of dollars.

115.   Such expenditures include, but are not limited to, legal fees associated with the Don Lee Action filed against, among others, the Company, its CFO (Nelson), and its Senior Quality Assurance Manager (Quetsch), and Director of Operations (Miller), and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

116.   Such losses include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants, including bonuses tied to the Company's

attainment of certain objectives and benefits paid to the Individual Defendants who breached their fiduciary duties to Beyond Meat. This compensation includes, but is not limited to, payments paid to Defendant Nelson under his retirement agreement, such as the $1,000 lump sum payment and the payments of the costs of monthly COBRA premiums for him and his dependents for up to 18 months, as well as his compensation under his contemporaneous consulting agreement.

117.   As a direct and proximate result of the Individual Defendants' conduct, Beyond Meat has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague Beyond Meat's stock in the future due to the Company's and the Individual Defendants' false statements and omissions and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, and violations of the Exchange Act.

## **DERIVATIVE ALLEGATIONS**

118.   Plaintiffs bring this action derivatively and for the benefit of Beyond Meat to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Beyond Meat, waste of corporate assets, and unjust enrichment, abuse of control, gross mismanagement, and violations of the Exchange Act, as well as the aiding and abetting thereof.

119.   Beyond Meat is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

120.   Plaintiffs are, and have continuously been at all relevant times, shareholders of Beyond Meat. Plaintiffs will adequately and fairly represent the interests of Beyond Meat in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## **DEMAND FUTILITY ALLEGATIONS**

121.   Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

122.   A pre-suit demand on the Board of Beyond Meat is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Brown, Goldman, Carhart, Lane, van Lengerich, Segal, Stone, Thompson, and Waller (collectively, the "Directors"). Plaintiffs need only to allege demand futility as to five of the nine Directors that were on the Board at the time this consolidated amended complaint is filed.

**All Directors**

123.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly, which caused the Company to make false and misleading statements in the 2020 Proxy Statement, which failed to disclose that in violation of the Code of Conduct: (1) the Company had engaged in the Fraudulent Misconduct; (2) the Company had engaged in the Wrongful Termination; (3) the Company had engaged in the Misappropriation, which was ongoing; and (4) the Company failed to maintain adequate internal controls. This fact renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the rest of the Individual Defendants.

124.   In complete abdication of their fiduciary duties, the Directors either engaged in the Fraudulent Misconduct, Wrongful Termination, and/or Misappropriation, which formed the basis of the false and misleading statements about the violations of the code of conduct and failed to maintain internal controls.

125.   Beyond Meat sells its plant-based meat products.  Beyond Meat's most successful product is the Beyond Burger, a popular vegan burger sold in thousands of grocery stores and restaurants across the U.S., Canada, and several other countries. Leading up to the Company's IPO in 2019, the Beyond Burger accounted for approximately 60% of the Company's revenue.  As such, Beyond Meat's sale of plant-based meat products, and, in particular, the Beyond Burger, is its core business.

126.   At all relevant times, Defendant Brown was the Company CEO and a director.

127.   Recognizing the importance of sales of plant-based meat products and that this was Beyond Meat's core business, Defendant Brown was directly involved in arranging for the manufacture of the Company's plant-based meat products.

128.   On December 2, 2014, Beyond Meat entered into the Supply Agreement with Don Lee, a producer of plant-based meat substitutes and other food products. On April 11, 2016, Beyond Meat and Don Lee entered into the first amendment to the supply agreement.   Under this amendment, Don Lee became the exclusive co-manufacturer for Beyond Meat's plant-based meat products, including the Beyond Burger which launched in May 2016.

129.   Evidencing Defendant Brown's direct involvement, he (on behalf of Beyond Meat) signed the Supply Agreement and amendments with Don Lee and was copied on the Notice of Termination letter sent to Don Lee by Beyond Meat's attorneys.

130.   As a Company director and its CEO, and also because the sale (and related manufacture) of plant-based meat products, and in particular the Beyond Burger, was and is its core business, Defendant Brown had a duty to promptly and fully inform all Directors of issues arising from and related to the manufacture of its plant-based meat products and specifically including Beyond Meat's relationship with Don Lee.   The failure of Defendant Brown to keep the Directors promptly and fully informed of manufacturing issues with Don Lee evidences internal control weaknesses.

131.   The Directors signed the 2019 Annual Report (on or about March 19, 2020). The 2019 Annual Report discusses the Don Lee Action in detail including its fraud and negligent misrepresentation claims.   Based thereon, by March 19, 2020 at the latest, the Directors knew of the claims that (1) Beyond Meat retained a third-party food safety consultant to perform an audit of Beyond Meat's manufacturing facility, (2) upon the third-party's completion of its inspection, it issued a report to Beyond Meat citing various

concerns, (3) as alleged in the Don Lee Action, Defendant Nelson and others altered the report by, among other things, deleting significant provisions of it, and (4) the altered report was ultimately delivered to Don Lee Farms to assuage its food safety concerns. This wrongful conduct at least in part led to the Don Lee Action.

132.   On March 1, 2021, the Directors caused the Company to file a Form 8-K with the SEC announcing Defendant Nelson's impending retirement with the Company and its entry into a Retirement Agreement and Consulting Agreement with Defendant Nelson.   The Retirement Agreement includes a "Non-Disparagement" provision that prohibits Defendant Nelson from making any statements that "would adversely affect in any manner (a) the conduct of the business of the Company or any of the Released Parties (including, but not limited to, any business plans or prospects) or (b) the reputation of the Company or any of the Released Parties [which includes the Directors and Beyond Meat]."   The Retirement Agreement also includes a general release by Defendant Nelson and for the benefit of the Directors and Beyond Meat.   Regarding the Consulting Agreement, its term is from May 6, 2021 through May 5, 2023.   The Directors caused the Company to publish a version of the Consulting Agreement that did not include the fees to be paid to Defendant Nelson; i.e., that portion of the Consulting Agreement is blank. On information and belief, Plaintiffs allege that the Retirement Agreement and Consulting Agreement were signed by Defendants Nelson and Brown because of the signature blocks on these agreements.

133.   No employment agreement between Defendant Nelson and Beyond Meat was attached to any Company annual report.   Based on this nonattachment, Plaintiffs allege that no written employment agreement exists.

134.   The 2020 Proxy Statement states that the Compensation Committee is responsible for reviewing and approving any severance or termination arrangements with the Company's executive officers.

135.   The 2020 Proxy Statement discusses severance arrangements with executive officers.  Regarding severance not in connection with a change in control, the 2020 Proxy Statement discusses this event in the context of its newly hired Chief Operating Officer only and provides for severance compensation in the event of termination without cause. Regarding change in control severance agreements, the 2020 Proxy Statement states that "[i]n November 2018, our compensation committee approved change in control severance benefits for our named executive officers."

136.   Regarding severance compensation to Defendant Nelson, his Retirement Agreement provides in relevant part:

> You acknowledge and agree that your retirement from the Company will not qualify as a termination of employment without Cause or for Good Reason under the terms of the Executive Change in Control Severance Agreement entered into by and between you and the Company effective as of November 15, 2018 (the "Change in Control Agreement") (regardless of whether the Company at any time undergoes a "Change in Control" (as defined in the Change in Control Agreement)), and you are not entitled to any severance under the Change in Control Agreement or under any other severance program/agreement in connection with your retirement from the Company.

137.   The Retirement Agreement and Consulting Agreement evidence that Defendant Nelson's "retirement" from Beyond Meat was not termination of employment without cause or good reason.  These agreements and the other conduct by the Directors as alleged herein further evidence the Directors' efforts to control Defendant Nelson, protect themselves, and hide the scope of these efforts from Plaintiffs and the investing public and the conduct of Defendant Nelson and others (as alleged in the Don Lee Action) by hiding the amount of compensation to Defendant Nelson through the Consulting and Retirement Agreements and including the non-disparagement provision discussed herein.

138.   As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

**Defendant Brown**

139.   Additional reasons that demand on Defendant Brown is futile follow. Defendant Brown is the founder of Beyond Meat and has served as its President and CEO since 2009. As Beyond Meat admits, he is a non-independent director. Beyond Meat provides Defendant Brown with his principal occupation, and he receives excessive compensation, including $8,010,451 during fiscal year 2019. Defendant Brown was ultimately responsible for all of the false and misleading statements and omissions that were made in the 2020 Proxy Statement, which he solicited as a member of the Board. As Beyond Meat's top officer and as a trusted Company director, he conducted little, if any, oversight of the Fraudulent Misconduct, Wrongful Termination, and Misappropriation (which Defendant Brown engaged in and/or permitted despite being aware of it) or the scheme to cause the Company to make false and misleading statements and omissions and consciously disregarded his duties to monitor such controls and engagement in the scheme alleged herein. Defendant Brown signed the Beyond Meat/Don Lee Supply Agreement, Amendments to the Supply Agreement, Nondisclosure Agreement (aka Mutual Confidentiality Agreement), and was copied of the May 23, 2017 Notice of Termination letter sent to Don Lee.  In fact, Defendant Brown caused Beyond Meat to terminate the Supply Agreement.

140.   Additionally, Defendant Brown signed the Retirement Agreement and Consulting Agreement with Defendant Nelson, evidencing his support of the Company's efforts to control Defendant Nelson, protect themselves, and hide the scope of these efforts from Plaintiffs and the investing public and the conduct of Defendant Nelson and others (as alleged in the Don Lee Action) by hiding the amount of compensation to

Consolidated Amended Shareholder Derivative Complaint

Defendant Nelson through the Consulting and Retirement Agreements and including the non-disparagement provision discussed herein.

141.   For these reasons, and further based on the allegations in the subsection under the heading "All Directors" (*see* ¶¶ 124-139), Defendant Brown breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

### Defendant Goldman

142.   Additional reasons that demand on Defendant Goldman is futile follow. Defendant Goldman serves as Chairman of the Board and has served as a Beyond Meat director since February 2013 and Executive Chair from February 2013 to February 2020. Goldman has received and continues to receive compensation for his role as a director as described in this consolidated complaint. As a trusted director, he conducted little, if any, oversight of the Fraudulent Misconduct, Wrongful Termination, and Misappropriation (which Goldman engaged in and/or permitted despite being aware of it) or Beyond Meat's engagement in the scheme to make false and misleading statements and omissions and consciously disregarded his duties to monitor such controls and engagement in the scheme alleged herein. Goldman was on Beyond Meat's Board at the time the Company terminated the Supply Agreement. Moreover, Goldman was responsible for all of the false and misleading statements and omissions that were made in the 2020 Proxy Statement, which he solicited as a member of the Board.

143.   For these reasons, too, Goldman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

### Defendant Carhart

144.   Additional reasons that demand on Defendant Carhart is futile follow. Defendant Carhart has served as a Beyond Meat director since January 2016 and also serves as a member of the Audit Committee. As a trusted director, she conducted little, if

any, oversight of the Fraudulent Misconduct, Wrongful Termination, and Misappropriation (which Defendant Carhart engaged in and/or permitted despite being aware of it) or Beyond Meat's engagement in the scheme to make false and misleading statements and omissions and consciously disregarded her duties to monitor such controls and engagement in the scheme alleged herein. Defendant Carhart was on its Board at the time Beyond Meat terminated the Supply Agreement. Moreover, Defendant Carhart was responsible for all of the false and misleading statements and omissions that were made in the 2020 Proxy Statement, which she solicited as a member of the Board.

145.   For these reasons too, Defendant Carhart breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

**Defendant Lane**

146.   Additional reasons that demand on Defendant Lane is futile follow. Defendant Lane has served as a Beyond Meat director since February 2015 and also serves as a member of the Human Capital Management and Compensation Committee. As a trusted director, he conducted little, if any, oversight of the Fraudulent Misconduct, Wrongful Termination, and Misappropriation (which Defendant Lane engaged in and/or permitted despite being aware of it) or Beyond Meat's engagement in the scheme to make false and misleading statements and omissions and consciously disregarded his duties to monitor such controls and engagement in the scheme alleged herein. Defendant Lane was on the Board at the time Beyond Meat terminated the Supply Agreement. Moreover, Defendant Lane was responsible for all of the false and misleading statements and omissions that were made in the 2020 Proxy Statement, which he solicited as a member of the Board.

147.   For these reasons too, Defendant Lane breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

Consolidated Amended Shareholder Derivative Complaint

**Defendant van Lengerich**

148.   Additional reasons that demand on Defendant van Lengerich is futile follow. Defendant van Lengerich has served as a Beyond Meat director since November 2016. Defendant van Lengerich has received and continues to receive compensation for his role as a director as described in this consolidated amended complaint. As a trusted director, he conducted little, if any, oversight the Fraudulent Misconduct, Wrongful Termination, and Misappropriation (which Defendant van Lengerich engaged in and/or permitted despite being aware of it) or of Beyond Meat's engagement in the scheme to make false and misleading statements and omissions and consciously disregarded his duties to monitor such controls and engagement in the scheme alleged herein. Defendant van Lengerich was on its Board at the time Beyond Meat terminated the Supply Agreement. Moreover, Defendant van Lengerich was responsible for all of the false and misleading statements and omissions that were made in the 2020 Proxy Statement, which he solicited as a member of the Board.

149.   For these reasons too, Defendant van Lengerich breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Segal**

150.   Additional reasons that demand on Defendant Segal is futile follow. Defendant Segal has served as a Beyond Meat director since November 2018 and also serves as a member of the Audit Committee. Defendant Segal has received and continues to receive compensation for his role as a director as described in this consolidated amended complaint. As a trusted director, he conducted little, if any, oversight of the ongoing Misappropriation (which Defendant Segal engaged in and/or permitted despite being aware of it) or Beyond Meat's engagement in the scheme to make false and misleading statements and omissions and consciously disregarded his duties to monitor such controls and engagement in the scheme alleged herein. Moreover, Defendant Segal

was responsible for all of the false and misleading statements and omissions that were made in the 2020 Proxy Statement, which he solicited as a member of the Board.

151.   For these reasons too, Defendant Segal breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Stone**

152.   Additional reasons that demand on Defendant Stone is futile follow. Defendant Stone has served as a Beyond Meat director since January 2012 and also serves as the Chair of the Nominating and Corporate Governance Committee. As a trusted director, he conducted little, if any, oversight of the Fraudulent Misconduct, Wrongful Termination, and Misappropriation (which Defendant Stone engaged in and/or permitted despite being aware of it) or Beyond Meat's engagement in the scheme to make false and misleading statements and omissions and consciously disregarded his duties to monitor such controls and engagement in the scheme alleged herein. Defendant Stone was on its Board at the time Beyond Meat terminated the Supply Agreement. Moreover, Defendant Stone was responsible for all of the false and misleading statements and omissions that were made in the 2020 Proxy Statement, which he solicited as a member of the Board.

153.   For these reasons too, Defendant Stone breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Thompson**

154.   Additional reasons that demand on Defendant Thompson is futile follow. Defendant Thompson has served as a Beyond Meat director since October 2015 and also serves as the Chair of the Human Capital Management and Compensation Committee. As a trusted director, he conducted little, if any, oversight of the Fraudulent Misconduct, Wrongful Termination, and Misappropriation (which Defendant Thompson engaged in

Consolidated Amended Shareholder Derivative Complaint

and/or permitted despite being aware of it) or Beyond Meat's engagement in the scheme to make false and misleading statements and omissions and consciously disregarded his duties to monitor such controls and engagement in the scheme alleged herein. Defendant Thompson was on its Board at the time Beyond Meat terminated the Supply Agreement. Moreover, Defendant Thompson was responsible for all of the false and misleading statements and omissions that were made in the 2020 Proxy Statement, which he solicited as a member of the Board.

155.   For these reasons too, Defendant Thompson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Waller**

156.   Additional reasons that demand on Defendant Waller is futile follow. Defendant Waller has served as a Beyond Meat director since November 2018 and also serves as the Chair of Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Waller received and continues to receive compensation for her role as a director as described in this consolidated amended complaint. As a trusted director, she conducted little, if any, oversight of the ongoing Misappropriation (which Defendant Waller engaged in and/or permitted despite being aware of it) or Beyond Meat's engagement in the scheme to make false and misleading statements and omissions and consciously disregarded her duties to monitor such controls and engagement in the scheme alleged herein. Moreover, Defendant Waller was responsible for all of the false and misleading statements and omissions that were made in the 2020 Proxy Statement, which she solicited as a member of the Board.

157.   For these reasons too, Defendant Waller breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

**Audit Committee Defendants (Carhart, Lane, and Waller)**

Consolidated Amended Shareholder Derivative Complaint

158.   Defendants Carhart, Segal, and Waller (the "Audit Committee Defendants"), served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the integrity of Beyond Meat's compliance with legal and regulatory requirements, matters implicating ethical concerns, and the adequacy of the Company's internal controls. The Audit Committee Defendants failed to ensure the integrity of Beyond Meat's internal controls, as they are charged to do under the Audit Committee Charter, which, among other things, allowed Beyond Meat to file filings with the SEC that made false and misleading statements.

159.   Beyond Meat sells plant-based meat products.   Beyond Meat's most successful product is the Beyond Burger, a popular vegan burger sold in thousands of grocery stores and restaurants across the U.S., Canada, and several other countries. Leading up to the Company's IPO in 2019, the Beyond Burger accounted for approximately 60% of the Company's revenue.  As such, Beyond Meat's sale of plant-based meat products, and in particular the Beyond Burger, is its core business.

160.   At all relevant times, Defendant Brown was the Company CEO and a director.

161.   Recognizing the importance of sales of plant-based meat products and that this was Beyond Meat's core business, Defendant Brown was directly involved in arranging for the manufacture of the Company's plant-based meat products.

162.   On December 2, 2014, Beyond Meat entered into the Supply Agreement with Don Lee, a producer of plant-based meat substitutes and other food products. On April 11, 2016, Beyond Meat and Don Lee entered into the first amendment to the supply agreement.  Under this amendment, Don Lee became the exclusive co-manufacturer for Beyond Meat's plant-based meat products, including the Beyond Burger which launched in May 2016.

163.   Evidencing Defendant Brown's direct involvement, he (on behalf of Beyond Meat) signed the Supply Agreement and amendments with Don Lee and was copied on the Notice of Termination letter sent to Don Lee by Beyond Meat's attorneys.

164.   As a Company director and its CEO, and also because the sale (and related manufacture) of plant-based meat products, and in particular the Beyond Burger, was and is its core business, Defendant Brown had a duty to promptly and fully inform the Audit Committee Defendants of issues arising from and related to the manufacture of its plant-based meat products and specifically including Beyond Meat's relationship with Don Lee.  Any failure of Defendant Brown to keep the Audit Committee Defendants promptly and fully informed of manufacturing issues with Don Lee evidences internal control weaknesses.

165.   Additional internal control weaknesses include (1) Beyond Meat retained a third-party food safety consultant to perform an audit of Beyond Meat's manufacturing facility, (2) upon the third-party's completion of its inspection, it issued a report to Beyond Meat citing various concerns, (3) Defendant Nelson and others altered the report by, among other things, deleting significant provisions of it, and (4) the altered report was ultimately delivered to Don Lee Farms to assuage its food safety concerns, as alleged in the Don Lee Action.

166.   Therefore, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

**Human Capital Management and Compensation Committee Defendants (Lane and Thompson)**

167.   Defendants Lane and Thompson (the "Human Capital Management and Compensation Committee Defendants") served as members of the Human Capital Management and Compensation Committee and regularly approved compensation for the Individual Defendants, despite the Fraudulent Misconduct, Wrongful Termination, and Misappropriation, which the Individual Defendants either engaged in or permitted. The

Consolidated Amended Shareholder Derivative Complaint

Human Capital Management and Compensation Committee Defendants engaged in the misconduct alleged herein and not only failed to take action to correct or prevent it but rewarded it. They failed to uphold their responsibilities with integrity and rewarded the Individual Defendants for the misconduct alleged herein. Thus, the Human Capital Management and Compensation Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

168.   The 2020 Proxy Statement states that the Compensation Committee is responsible for reviewing and approving any severance or termination arrangements with our executive officers.

169.   Defendants Lane and Thompson signed the 2019 Annual Report (on or about March 19, 2020).   The 2019 Annual Report discusses the Don Lee Action in detail including its fraud and negligent misrepresentation claims.   Based thereon, by March 19, 2020 at the latest, the Defendants Lane and Thompson knew of the claims that (1) Beyond Meat retained a third-party food safety consultant to perform an audit of Beyond Meat's manufacturing facility, (2) upon the third-party's completion of its inspection, it issued a report to Beyond Meat citing various concerns, (3) as alleged in the Don Lee Action, Defendant Nelson and others altered the report by, among other things, deleting significant provisions of it, and (4) the altered report was ultimately delivered to Don Lee Farms to assuage its food safety concerns. This wrongful conduct at least in part led to the Don Lee Action.

170.   On March 1, 2021, the Directors caused the Company to file a Form 8-K with the SEC announcing Defendant Nelson's impending (and now completed) retirement with the Company and its entry into a Retirement Agreement and Consulting Agreement with Defendant Nelson.   The Retirement Agreement includes a "Non-Disparagement" provision that prohibits Defendant Nelson from making any statements that "would adversely affect in any manner (a) the conduct of the business of the Company or any of the Released Parties (including, but not limited to, any business plans

or prospects) or (b) the reputation of the Company or any of the Released Parties [which includes the Directors and Beyond Meat]."  The Retirement Agreement also includes a general release by Defendant Nelson and for the benefit of the Directors and Beyond Meat.  Regarding the Consulting Agreement, its term is from May 6, 2021 through May 5, 2023.  The Directors caused the Company to publish a version of the Consulting Agreement that did not include the fees to be paid to Defendant Nelson; i.e., that portion of the Consulting Agreement is blank.  On information and belief, Plaintiffs allege that the Retirement Agreement and Consulting Agreement were signed by Defendants Nelson and Brown because of the signature blocks on these agreements.

171.   No employment agreement between Defendant Nelson and Beyond Meat was attached to any Company annual report.  Based on this nonattachment, Plaintiffs allege that no written employment agreement exists.

172.   The 2020 Proxy Statement states that the Compensation Committee is responsible for reviewing and approving any severance or termination arrangements with our executive officers.  Based thereon, Defendants Lane and Thompson were required to review and approve any severance or termination arrangements with Defendant Nelson, taking into consideration his conduct as alleged herein and in the Don Lee Action; i.e., the Retirement Agreement and Consulting Agreement.

173.   The 2020 Proxy Statement discusses severance arrangements with executive officers.  Regarding severance not in connection with a change in control, the 2020 Proxy Statement discusses this event in the context of its newly hired Chief Operating Officer only and provides for generous severance compensation in the event of termination without cause, only.  Regarding change in control severance agreements, the 2020 Proxy Statement states that "[i]n November 2018, our compensation committee approved change in control severance benefits for our named executive officers."

174.   Regarding severance compensation to Defendant Nelson, his Retirement Agreement provides in relevant part:

> You acknowledge and agree that your retirement from the Company will not qualify as a termination of employment without Cause or for Good Reason under the terms of the Executive Change in Control Severance Agreement entered into by and between you and the Company effective as of November 15, 2018 (the "Change in Control Agreement") (regardless of whether the Company at any time undergoes a "Change in Control" (as defined in the Change in Control Agreement)), and you are not entitled to any severance under the Change in Control Agreement or under any other severance program/agreement in connection with your retirement from the Company.

175.   The Retirement Agreement and Consulting Agreement evidence that Defendant Nelson's "retirement" from Beyond Meat was not termination of employment without cause or for good reason.  These agreements and the other conduct by the Directors as alleged herein further evidence the Directors' efforts to control Defendant Nelson, protect themselves, and hide the scope of these efforts from Plaintiffs and the investing public and the conduct of Defendant Nelson and others (as alleged in the Don Lee Action) by hiding the amount of compensation to Defendant Nelson through the Consulting and Retirement Agreements and including the non-disparagement provision discussed herein.

176.   As a result of the foregoing, the Defendants Lane and Thompson breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

**Additional Reasons That Demand on the Board is Futile**

177.   The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendant Stone is the co-founder and creative director of Twitter, Inc., where Defendant Segal has served as CFO since 2017. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls

and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

178.   In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Fraudulent Misconduct, Wrongful Termination, and Misappropriation (which the Directors engaged in and/or permitted despite being aware of it), or the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, abuse of control, gross mismanagement, and violations of the Exchange Act. Also in violation of the Code of Conduct, the Directors failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

179.   Beyond Meat has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Beyond Meat any part of the damages Beyond Meat suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

180.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

181.   The acts complained of herein constitute violations of fiduciary duties owed by Beyond Meat's officers and directors, and these acts are incapable of ratification.

182.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Beyond Meat. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Beyond Meat, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

183.   If there is no directors' and officers' liability insurance, then the Directors will not cause Beyond Meat to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

184.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
**Against Defendants Brown, Nelson, Goldman, Carhart, Lane, van Lengerich, Segal, Stone, Thompson, and Waller for Violations of Section 14(a) of the Exchange Act**

185.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

186.   The claims made pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), that are alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of Defendants Brown, Nelson, Goldman, Carhart, Lane, van Lengerich, Segal, Stone, Thompson, and Waller. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

187.   Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

188.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

189.   Under the direction and watch of the Directors, the 2020 Proxy Statement failed to disclose, inter alia, that: (1) the Company had engaged in the Fraudulent Misconduct; (2) the Company had engaged in the Wrongful Termination; (3) the Company had engaged in the Misappropriation, which was ongoing; and (4) the Company failed to maintain adequate internal controls.

190.   Defendants Brown, Nelson, Goldman, Carhart, Lane, van Lengerich, Segal, Stone, Thompson, and Waller also caused the 2020 Proxy Statement to be false and

Consolidated Amended Shareholder Derivative Complaint

misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose the Fraudulent Misconduct, the Wrongful Termination, the Misappropriation, and that the Company's compensation policies and procedures were utilized in to reward such conduct.

191.  Moreover, the 2020 Proxy Statement was false and misleading when it discussed the Company's Code of Conduct, due to the Individual Defendants' failure to abide by the Code of Conduct, and their engagement in or the tolerance of the Fraudulent Misconduct, the Wrongful Termination, the Misappropriation, and scheme to cause the Company to issue false and misleading statements and omissions of material fact.

192.  In the exercise of reasonable care, Defendants Brown, Nelson, Goldman, Carhart, Lane, van Lengerich, Segal, Stone, Thompson, and Waller should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the Proxy Statement, including, but not limited to, election of directors and the ratification of an independent auditor.

193.  The false and misleading elements of the 2020 Proxy Statement led to the reelection of Defendants Goldman, Stone, and Waller which allowed them to continue engaging in and/or permitting the Misappropriation and to continue breaching their fiduciary duties to Beyond Meat.

194.  The Company was damaged as a result of Defendants Brown, Nelson, Goldman, Carhart, Lane, van Lengerich, Segal, Stone, Thompson, and Waller's material misrepresentations and omissions in the 2020 Proxy Statement.

195.  Plaintiffs on behalf of Beyond Meat have no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

196.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

197.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Beyond Meat's business and affairs.

198.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

199.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Beyond Meat.

200.   In breach of their fiduciary duties, the Individual Defendants either engaged in or permitted, and/or allowed the Company to engage in the Fraudulent Misconduct, the Wrongful Termination, and the Misappropriation.

201.   In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

202.   In further breach of their fiduciary duties owed to Beyond Meat, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that in violation of the Code of Conduct: (1) the Company had engaged in the Fraudulent Misconduct; (2) the Company had engaged in the Wrongful Termination; (3) the Company had engaged in the Misappropriation, which was ongoing; and (4) the Company failed to maintain adequate internal controls.

203.   The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

204.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly.

205.   The Individual Defendants had actual or constructive knowledge that they had caused Beyond Meat to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that Beyond Meat was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

206.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

207.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Beyond Meat has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

208.   Plaintiffs on behalf of Beyond Meat have no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

209.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

210.   By their wrongful acts, violations of law, and/or false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Beyond Meat.

211.   The Individual Defendants either benefitted financially from the improper conduct and they received unjustly lucrative bonuses that were tied to the misconduct alleged herein, or received bonuses, stock options, or similar compensation from Beyond Meat that were unjust in light of the Individual Defendants' bad faith conduct.

212.   Plaintiffs, as shareholders and representatives of Beyond Meat, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits—including from benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

213.   Plaintiffs on behalf of Beyond Meat have no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

214.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

215.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (such as the Don Lee Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

216.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

217.   Plaintiffs on behalf of Beyond Meat have no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Abuse of Control

218.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

219.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Beyond Meat, for which they are legally responsible.

220.   As a direct and proximate result of the Individual Defendants' abuse of control, Beyond Meat has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Beyond Meat has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

221.   Plaintiffs on behalf of Beyond Meat have no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

222.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

223.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Beyond Meat in a manner consistent with the operations of a publicly held corporation.

224.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Beyond Meat has sustained and will continue to sustain significant damages.

225.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

226.   Plaintiffs on behalf of Beyond Meat have no adequate remedy at law.

## SEVENTH CLAIM

### Against the ProPortion and CLW for Aiding and Abetting Breach of Fiduciary Duty

227.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

228.   ProPortion and CLW aided and abetted the Individual Defendants who breached their fiduciary duty to Beyond Meat.

229.   ProPortion and CLW's misconduct resulted in continuous, connected, and ongoing harm to the Company.

230.   Specifically, ProPortion and CLW engaged in the Wrongful Termination as they had, in violation of the Supply Agreement, negotiated with Beyond Meat prior to, during, and after the Wrongful Termination to begin producing and, indeed, started producing Beyond Meat's products, including the Beyond Burger, just weeks after the Wrongful Termination despite having no prior experience mass-producing plant-based protein products. Moreover, ProPortion and CLW engaged in the Misappropriation since they began utilizing protocol for the processing of the Beyond Burger that was nearly identical to Don Lee's proprietary process.

231.   ProPortion and CLW are jointly and severally liable to the same extent as the Individual Defendants are liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

Consolidated Amended Shareholder Derivative Complaint

232.   As a direct and proximate result of ProPortion and CLW's aiding and abetting of the Individual Defendants' breaches of duty alleged herein, Beyond Meat has sustained and will continue to sustain substantial damages.

233.   Plaintiffs on behalf of Beyond Meat have no adequate remedy at law.

## PRAYER FOR RELIEF

234.         FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiffs may maintain this action on behalf of Beyond Meat, and that Plaintiffs are adequate representatives of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Beyond Meat;

(c) Declaring that ProPortion and CLW have aided and abetted the breach of the Individual Defendants' fiduciary duties to Beyond Meat;

(d)   Determining and awarding to Beyond Meat the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants and ProPortion and CLW, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(e)   Directing Beyond Meat and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Beyond Meat and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Beyond Meat to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(f)     Awarding Beyond Meat restitution from the Individual Defendants, and each of them;

(g)     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(h)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: May 24, 2021                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Robert C. Moest*
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

Consolidated Amended Shareholder Derivative Complaint

**TOSTRUD LAW GROUP, P.C.**


*/s/ Jon A. Tostrud*
Jon A. Tostrud
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
Telephone: (310) 278-2600
Facsimile: (310) 278-2640
Email: jtostrud@tostrudlaw.com


**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com

*Counsel for Plaintiffs*

Consolidated Amended Shareholder Derivative Complaint

**VERIFICATION**

I, Kimberly Brink, am a plaintiff in the within action.  I have reviewed the allegations made in this Consolidated Amended Shareholder Derivative Complaint, know the contents thereof, and authorize its filing.  To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this _19th_ day of May 2021.

KIMBERLY BRINK

1

## VERIFICATION

I, Eric Weiner, am a plaintiff in the within action.  I have reviewed the allegations made in this Consolidated Amended Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 18th day of May, 2021.

DocuSigned by:

*Eric Weiner*

8F30F1ED6F6D458...

Eric Weiner

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **<u>VERIFICATION</u>**

I, Melvyn Klein, am a plaintiff in the within action.  I have reviewed the allegations made in this Consolidated Amended Shareholder Derivative Complaint, know the contents thereof, and authorize its filing.  To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 19th day of May 2021.

*/s/ Melvyn Klein*
MELVYN KLEIN